No. 22-1382

_____

# United States Court of Appeals
## For the Fourth Circuit

_____


**JEFFREY B. ISRAELITT**

**Appellant**

v.

**ENTERPRISE SERVICES LLC**

**Appellee**

_____


**On Appeal from the United States District Court for the District of Maryland**
**The Honorable Stephanie A. Gallagher, Presiding**
**Case No. 1:18-cv-01454-SAG**

_____


**BRIEF OF THE APPELLANT**

_____


Levi S. Zaslow
SMITHEY LAW GROUP LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990 (phone)
(410) 280-1602 (fax)
Levi.Zaslow@smitheylaw.com
*Attorney for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-1382__        Caption: __JEFFREY B. ISRAELITT v. ENTERPRISE SERVICES LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__JEFFREY B. ISRAELITT__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Levi S. Zaslow                    Date:    April 21, 2022

Counsel for: Appellant Jeffrey B. Israelitt

Print to PDF for Filing

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF CONTENTS ......................................................................................... iii

TABLE OF AUTHORITIES ................................................................................... v

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF ISSUES ..................................................................................... 1

STATEMENT OF CASE ......................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................... 23

ARGUMENT ........................................................................................................... 25

   I.  Standard of Review .......................................................................................... 25

      a.  Statutory Interpretation and Questions of Law ........................................... 25

      b.  Motion for Summary Judgment ................................................................... 25

   II.  Discussion of the Issues ................................................................................... 26

      a.  The District Court erroneously ruled compensatory damages and a jury trial are unavailable in ADA retaliation claims as a matter of law ............. 26

      b.  The District Court erroneously dismissed Plaintiff's ADA discrimination claims on summary judgment and applied the wrong legal standards ........ 40

         1.  HP's reasoning was a mere pretext ........................................................ 48

      c.  The District Court erroneously held that adverse actions, including removal from meetings, increased workloads, severely tightened

deadlines, and being removed from billable work, are not actionable adverse actions...................................................................................... 52

    d.  The District Court relied on evidence not admitted at trial, and which was otherwise inadmissible, in its Memorandum of Decision and Order of Judgment.......................................................................................... 53

CONCLUSION................................................................................................ 54

STATEMENT REGARDING ORAL ARGUMENT ................................................. 54

CERTIFICATE OF COMPLIANCE...................................................................... 55

CERTIFICATE OF SERVICE .............................................................................. 56

# <u>TABLE OF AUTHORITIES</u>

## CASES

*A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 362
(4th Cir. 2008) .................................................................................... 33

*Aguirre v. City of Miami*, No. 04-23205-CIV, 2007 WL 9701708, at *2 (S.D. Fla.
July 18, 2007) ..................................................................................... 38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................... 26, 44

*Barnhart v. Walton*, 535 U.S. 212, 218 (2002) ........................................................ 29

*Baird v. Rose*, 192 F.3d 462, 471–72 (4th Cir. 1999) ............................................... 33

*Baker v. Windsor Republic Doors*, (W.D. Tenn. 2009), *aff'd*, 414 App'x 764 (6th
Cir. 2011) ............................................................................................ 37

*Baumgardner v. County of Cook*, 108 F.Supp.2d 1041, 1044–45 (N.D.Ill.2000) ..... 34

*Billings v. Town of Grafton*, 515 F.3d 39, 54-55) ..................................................... 53

*Bowles v. Carolina Cargo, Inc.*, 100 F. App'x 889, 890 (4th Cir. 2004)
(unpublished) ....................................................................................... 14

*Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) ..................................... 28

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ........................ 53

*Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 199 (D.D.C. 2015) ................ 49

*EEOC v. Mfrs. & Traders Tr. Co.*, 402 F. Supp. 3d 201, 234 (D. Md. 2019) ........... 48

*EEOC v. Wal–Mart Stores, Inc.,* 187 F.3d 1241, 1249 (10th Cir. 1999) ................. 39

*Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, 956 F. Supp. 2d 695,
707 (E.D. Va. 2013) ............................................................................... 33

*Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 558 (2005) ........................ 30

*Edwards v. Brookhaven Sci. Assocs., LLC*, 390 F. Supp. 2d 225, 235 (E.D.N.Y. 2005) ............................................................................................32, 35-36

*Fink v. Richmond*, 405 Fed. App'x 719 (4th Cir. 2010) .......................................... 46

*First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 867 (4th Cir. 1989).............................................................................. 29, 31

*Fordyce v. Prince George's County Md.*, 2014 U.S. Dist. LEXIS 117967, *24 (D. Md. 2014)............................................................................................. 49, 52

*Foster v. Time Warner Entertainment Co.,* 250 F.3d 1189, 1196–98 (8th Cir. 2001)38

*Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001)................................ 33

*Frogge v. Fox*, No. 1:17-cv-155, 2019 WL 2418749, at *6 (N.D.W. Va. June 10, 2019) ................................................................................................... 46

*Garofolo v. Donald B. Heslep Assocs.*, 405 F.3d 194, 198 (4th Cir. 2005) ............. 26

*Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013)..................... 45

*Gómez–Pérez v. Potter*, 553 U.S. 474 (2008)..................................................... 37, 39

*Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702-03 (4th Cir. 2001) ............ 41

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016)............. 26

*Kramer v. Banc of Am. Sec.,* 355 F.3d 961, 965 (7th Cir.2004)................... 27, 28, 29

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 573 (4th Cir. 2015)29, 31, 40- 42

*Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010) ................ 34, 53

*Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251(N.D. Ala. 2013)......... 45

*Mueller v. Rutland Mental Health Servs., Inc.*, No. 1:05-CV-38, 2006 WL 2585101, at *5 (D. Vt. Aug. 17, 2006) ....................................................... 38

*Muller v. Costello,* 187 F.3d 298, 315 (2d Cir.1999)) ................................. 38

*Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997) ..................................... 34

*Rhoads v. F.D.I.C.*, 94 F. App'x 187, 188 (4th Cir. 2004) (unpublished) ............... 27

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ................................. 30

*Rumler v. Dep't of Corr., Fla.*, 546 F. Supp. 2d 1334, 1342
(M.D. Fla. 2008) .......................................................... 29, 36-37

*Salitros v. Chrysler Corp.,* 306 F.3d 562, 577 (8th Cir. 2002) .................................. 39

*Scarborough v. Atl. Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1949) ............. 30

*Stamper v. Kaiser Found. Health Plan of the Nw.*, No. 08-6335-HO, 2010 WL
2720708, at *5 (D. Or. July 7, 2010) ....................................... 39

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir.
1997) ................................................................... 34

*Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009) ............ 25

*Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 817 (4th Cir. 1995) ...................... 25

*Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014) ....................................... 26

*Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013) ... 25

## STATUTES AND REGULATIONS

29 C.F.R. § 1630.2(j) .......................................................... 43-44

42 U.S.C. § 1981 .............................................................. 32

42 U.S.C. § 12102 ............................................................. 44-45

42 U.S.C. § 12117 ............................................................. 31

42 U.S.C. § 12203 ............................................................. 31

## RULES

Fed. R. Civ. P. 56 ................................................................................ 26

Fourth Circuit Local Rule 32.1 .......................................................... 28

## JURY INSTRUCTIONS

Eleventh Circuit Pattern Jury Instructions § 4.22 .............................. 38

Fifth Circuit Pattern Jury Instructions (Civil Causes) § 11.11 .................. 38

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1331 as this matter arises out of a federal question.  This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from a final decision of the District Court.

## STATEMENT OF ISSUES

1.  Whether the District Court erred in holding that, as a matter of law, a plaintiff is not entitled to compensatory damages or a jury trial in an ADA retaliation claim?

2.  Whether the district court erred in granting summary judgment in favor of Defendant on Plaintiff's ADA discrimination claims?

3.  Whether the district court erred in holding that adverse actions, including being removed from meetings, severely tightened deadlines, and being removed from billable work are not actionable adverse actions in an employment retaliation claim?

4.  Whether the district court erred in relying on inadmissible evidence that was not admitted at trial in its Memorandum of Decision and Order of Judgment?

## STATEMENT OF CASE

### I.    Introduction.

This case concerns Defendant Enterprise Services' discrimination and retaliation against Jeffrey B. Israelitt.  Mr. Israelitt was hired as a senior IT

architect for Defendant (then HP). Mr. Israelitt suffers from hallux rigiditis, has a degenerative condition in his foot, and has a Maryland disability placard. In August and September 2013 Mr. Israelitt was instructed to attend a multi-day company seminar so he requested a disability accommodation to stay on-site. Without the interactive process, he was then told to not attend. Despite his attempts to resolve the issue, he was advised to drop the issue, let it go, and not attend this important event. He was then immediately met with retaliation and discrimination, including exclusion from team meetings and effectively being kicked off the team.

Matters began improving in October and November when he did not initiate any further requests or discuss his disability.  However, in December 2013 HP announced it would be holding team-building exercises and company seminars in Florida, which appeared to require much walking. Mr. Israelitt requested an accommodation of being added as an additional driver to one of the rental cars being rented. Mr. Israelitt was immediately kicked off the trip and was effectively removed from all billable employment at HP.  The first day after this trip, HP issued a performance warning severely tightening Plaintiff's deadlines to impossible levels, effectively ending his employment 30 days later.

Plaintiff filed suit, including for discrimination and retaliation.  The district court dismissed Plaintiff's disability claims on summary judgment but scheduled a jury trial on Plaintiff's retaliation claim.  Shortly before trial, after a jury trial was

2

long-scheduled, Defendant moved to strike the jury demand, which the district court granted. After a two-day bench trial, the court found in favor of Defendant on Plaintiff's claims of retaliation.

## II.    Statement of Facts.

### a.    Mr. Israelitt's Background.

Mr. Israelitt has extensive experience in IT and management, including working as a senior systems security engineer, computer scientist, and independent consultant. **JA1182-84**. He served honorably in the US Army from 1976 through 1999 and also worked for the NSA. *Id.* He also has experience with policy, lab and production type environments, and expertise in governance, compliance, and regulation. **JA118.**

Due to a service-related issue and ongoing condition, Mr. Israelitt suffers from a disability. Among other issues he suffers from a condition in his foot called hallux rigiditis. **JA1185-87.** He has degenerative changes in the right first metatarsophalangeal joint and right great toe. *Id.* Mr. Israelitt also had at least two cheilectomies in 1993 and 1997. *Id.* He currently has, and at all relevant times had, State of Maryland disability placards as a result of his condition. **JA1021; 1188-93**.

Mr. Israelitt's condition is so significant that, at times, he "can barely walk" because of the pain. **JA1014**. It is "extremely painful" and causes "[p]artial loss"

3

of use of the foot.  **JA1015-16**.  The toe problem even affects his ability to dress or bathe himself.  **JA1017**.  Tellingly, on summary judgment, Defendant's designee, when asked whether Defendant is challenging Mr. Israelitt's disability in this litigation simply stated "I don't think it's HP's position to make a declaration about his medical status and actual disability status." **JA1155-56**.

### b.    Mr. Israelitt is hired at HP.

George Romas interviewed Mr. Israelitt.  Mr. Romas found him to be qualified based on his resume and interviewing him.  The interview was a phone interview.  **JA923.**  In the interview, Mr. Romas did not inquire about any disability or medical condition of Mr. Israelitt.  **JA1039-40**.

Mr. Israelitt was hired as a senior architect.  Mr. Romas described his duties as follows: "The main duties were to formulate architectural decisions on IT, information systems, for government customers. And kind of the lab environment we had, the R&D focus, look at innovative technologies and how they fit into either government standard architectures or evolving architectures that would form or create a discriminator for HP in order to win business." **1039.**  This was a "senior role." **JA1039**.

### c.    Mr. Israelitt is instructed to attend HP Protect 2013.

HP Protect 2013 was an important event.  At the time, Mr. Romas described to Mr. Israelitt how valuable his attendance at HP Protect 2013 would be, that he

would go, and that Mr. Doty was coordinating. Part of the job Mr. Israelitt was hired to do was to be an expert in the area of architecture with security products and being able to know how to utilize those products in support of the customers' missions. Mr. Israelitt was advised by Mr. Romas and Mr. Doty, and agreed, that this would be of specific value in his mission, learn the products, implement those products, and help in my success at HP. As senior architect, this would have been very helpful in seeing the products. Further, attending and working with the products would have been valuable in completing the Technology Roadmap that was later assigned. **JA929, at ¶32.**

Defendant's corporate designee noted that as part of Mr. Israelitt's duties he was "to be an expert in the area of -- of architecture in terms of with security products and being able to know how to utilize those products in support of our customers'' missions." **JA1144**. Clearly it made perfect sense to instruct Mr. Israelitt to be present at the HP Protect Conference to learn the HP products, become "expert" in them, and learn to "utilize those products."

Likewise, in an e-mail exchanged between Gail Stevens, the capture manager, and Teri Friedlander, the campaign marketing manager, it became clear that it was so important for attendance that Ms. Friedlander observed that they were "scrambling to find the funds to pay for George and one of his engineers to attend the event." **JA1197**. Moreover, Ms. Stevens indicates that: "We would like

to have George Romas (Cyber Security Engineering Lead) and Jeff Israelitt (Lead Architect for our CDM Offering and the Task Oders) attend, and I would like to attend, and I think we might have 1 other person. **JA1197**.

Kevin Doty, a project manager, likewise express the value of attending in an e-mail to Todd Helfrich, stating: "We are working with the ESM and EV product teams as you know, and have seen **about a dozen sessions to be presented at Protect 2013 related to our CM efforts that would be valuable to hear, and to engage with the authors/SMEs**. **We were considering having one of our solution architects, and possibly myself attend Protect 2013**. **JA1199-1202**. (emphasis added). Mr. Helfrich specifically asked "which are the 4 **priorities**." *Id.* (emphasis added). Mr. Doty responded they had identified three people they would like to attend, and the first person he lists is Jeffrey Israelitt, Solutions Architect. ***Id.***

Mr. Romas admitted that Mr. Doty, on the "management and admin side," identified Mr. Israelitt as someone who should attend and that Mr. Romas never objected or suggested Mr. Israelitt should not attend in any way. **JA1044-48**. Quite simply, it was HP that directed Mr. Israelitt to attend HP Protect and described the value of it to him.

Almost immediately after learning he would be attending HP Protect 2013, Mr. Israelitt registered for the conference. **JA968**. *See also* **JA1217** ("Following

6

up from out text messages yesterday (Saturday, 9/14/2013), I got a login when I initially registered weeks ago, so I'm not sure who told you I did not, but given the other information you told me you received, I'm not surprised."). Mr. Romas admitted that he did not even know one way or the other whether Mr. Israelitt properly followed the registration instructions. **JA1059.**

### d.    Mr. Israelitt's attempts to secure alternative lodging due to his disability.

Given his mobility issues, Mr. Israelitt simply sought to stay at the event hotel rather than another nearby hotel or drive in. **JA970**. Mr. Israelitt specifically discussed with Mr. Romas his disability concerns. **JA929, at ¶30**.

Additionally, Plaintiff wrote to Mr. Romas, contemporaneously, complaining that Mr. Helfrich, Mr. Doty, and others were claiming incorrectly that his disability was creating a problem. **JA1218.** He referenced his disability multiple times during this single e-mail exchange to Mr. Romas, along with his requests for disability accommodation. **JA1218** (referencing "disability" or "accommodation" five times in two e-mail exchanges).

Incredibly, Mr. Romas submitted an affidavit on summary judgment claiming that Mr. Israelitt did not discuss his disability with him before HP Protect 2013. But this was simply not true. In his deposition, Mr. Romas could only muster "I don't recall." **JA1052-53**. Further, as reflected above, he most certainly did. **JA1218.** Further, in another contemporaneous e-mail, Mr. Israelitt wrote: "**I**

7

**actually reached out to George [Romas]** before I sent the email to you, and in a just concluded call, he said it doesn't look like I can go to the event. He said he heard this was as a result of my asking the registration team questions. **I told him that the only question I asked involved *disability accommodation* for lodging**…." **JA1206.**

Mr. Doty claimed that requesting a disability accommodation created a problem for HP. **JA987.** Mr. Doty "unloaded" on Mr. Israelitt, including being rude, yelling, and using "quite a bit of foul language. **JA987.**

In response to what should have been a simple request for disability accommodation, **JA930, at ¶ 36,** Mr. Romas' handling of the issue is incredible. He did not refer the matter to HR, HP legal, or engage in any investigation. **JA1056-57.** Instead, after consulting with Mr. Israelitt, Mr. Romas' resolution was to "not bring up the disability issue and not attend. The effect of his advice was for [Mr. Israelitt] to 'keep [his] mouth shut' about the issue. **JA930, at ¶ 36.** Mr. Romas effectively admits this, writing in an e-mail on September 13, 2013: "after about a 45 minute conversation with Jeff at around 7pm last night, he said he would 'keep his mouth shut' about this, not attend HP Protect, and hoped that the rest of us would not have any trouble attending." **JA1204.**

Mr. Doty, the project manager, then made wild, absurd claims concerning Mr. Israelitt (which the defense attempted to adopt at summary judgment). These

8

claims made little sense. According to Mr. Doty's Friday, September 13, 2013 e-mail at 1:05 a.m. (after he finished watching a football game), he claims he had a conversation with Mr. Israelitt on Wednesday, September 11 that made him think that Mr. Israelitt was lacking "stability" and "rationality," was not "appropriate" or "professional" like anything he "ever encountered in [his] 28 years in this field," he was "increasingly concerned," and Mr. Israelitt was "ludicrous." **JA1205**. Mr. Doty claims he had a conversation with Mr. Israelitt on Wednesday that made him believe that he was completely unhinged and unstable. Mr. Doty also makes wild claims that Mr. Israelitt has "prowess" creating lawsuits, will claim he was discriminated against based on his religion, and also make up a fake disability. *Id.* This is all totally implausible.

After the call on Wednesday Mr. Doty did not report such a "ludicrous" call to Mr. Romas. All day Thursday and Thursday evening Mr. Doty did not report this purportedly mad behavior by Mr. Israelitt. **JA1179-80.** It was not until *after* Mr. Israelitt sent an e-mail to Mr. Doty on Thursday evening, September 12, 2013 *specifically citing his concerns about his requests for a disability accommodation* that Mr. Doty sent his wild e-mail to Mr. Romas disparaging Mr. Israelitt. It is just not plausible that if he had such a "ludicrous" call that supposedly made him question Mr. Israelitt's stability, rationality, appropriateness, and professionalism that he would simply do nothing about it. It is telling that he waited until *after* Mr.

Israelitt put his concerns that he was being discriminated against because of his disability, **JA1206,** that Mr. Doty created this. Even Defendant's designee admits that Mr. Israelitt did not threaten HP with a lawsuit or raise his religion. **JA1150**.

Other than this case, Mr. Israelitt has never even been a party to a lawsuit. **JA943.** Moreover, there is no evidence in the record here of Mr. Israelitt ever raising his religion as a basis of being discriminated against. Rather, Mr. Israelitt's e-mail immediately prior provides the precise explanation for what happened here: he informed Mr. Romas he was simply asking for assistance with "disability accommodation for lodging." **JA1206**. Mr. Romas himself admitted that Mr. Doty's claims show up nowhere in Mr. Israelitt's contemporaneous e-mail. **JA1056.** Moreover, Mr. Israelitt contemporaneously wrote: "<u>So it appears that this information (*medical/disability info* that I asked you not to share with anyone) which you and I discussed found its way to Todd, and has in itself become the reason I can't go now.</u>" **JA1206**.

Plaintiff, through an amicable conversations with the event staff, was able to secure a reservation with his own credit card. **JA930, at ¶ 34; Ex. 2, Israelitt Depo., at JA977, JA982; JA1203; JA1218.** All of the individuals identified by HP to attend were able to *except for Mr. Israelitt*. **JA976; JA1176-77.**

Nevertheless, after informing Mr. Romas of his disability-related concerns, Mr. Romas and Mr. Doty engaged in a side conversation. On Friday morning,

September 13, 2013, Mr. Romas wrote to Mr. Doty that he had a 45 minute conversation with Mr. Israelitt and the solution was Mr. Israelitt "would 'keep his mouth shut' about this, not attend HP Protect, and hoped that the rest of [the team] would not have any trouble attending." **JA1204**.

Continuing the side-communications concerning Mr. Israelitt's simple request for a disability accommodation, that same day, Friday, September 13, 2013, Mr. Doty made clear he was engaging in side communications with Jess May concerning Mr. Israelitt and HP Protect. The inference from these e-mails is clear that he had been discussing Mr. Israelitt's disability concerns with Ms. May and Mr. Kinney. He writes to Ms. May that "I knew he would not let this go even after he agreed to George that he would do so… ." **JA1213**. He then forwards communication to Heath Kinney, the "scrum master" (i.e. the individual running the daily meetings). Mr. Doty disparages Mr. Israelitt further by stating "For your eyes only please….I'm not surprised. We are dealing with an immature adult." **JA1213**. Mr. Kinney responded "funny." **JA1213**. Notably, as discussed below, it was Jess May who kicked Mr. Israelitt off the team when he requested an accommodation a second time in December 2013.

Mr. Romas admitted that he and Mr. Israelitt engaged in subsequent discussions where Mr. Israelitt voiced his concerns about being treated unfairly with respect to HP Protect 2013. **JA1058.**

11

**e.     Almost immediately after HP Protect 2013 Defendant begins to exclude Mr. Israelitt from the team.**

In August and at least part of September (prior to the HP Protect disability complaint), Mr. Israelitt attended and was involved in all daily meetings. **JA1062**. Everything changed for Mr. Israelitt after he made the disability accommodation request and expressed his concerns with his treatment because of his disability relating to the HP Protect Conference. At that point, "it was like a switch flipped and everything was different." **JA1024.**

Almost immediately, Defendants began excluding Mr. Israelitt from the team. For example, on September 23, 2013, Jess May sent a "high importance" e-mail related to ArcSight Connectors and specifically relating to architecture and the HP products. **JA1239**; **JA1113.** Mr. Kalibjian immediately was concerned that Ms. May did not discuss this with the architects before sending the high importance e-mail and forwarded the e-mail to Mr. Israelitt expressing that concern. *Id.* Indeed, Mr. Israelitt was a senior architect for HP. Mr. Israelitt agreed with Mr. Kalibjian but also noted, "[a]t least you were included in her distribution." *Id.* Mr. Kalibjian was clearly shocked Mr. Israelitt was not even included, stating: "Wow did not notice she left you out. Double penalty on her or that!!!" *Id.* Thus, barely a week after Mr. Israelitt reveals his disability and requests and accommodation, and just 2 business days after HP Protect concluded, for the first time Mr. Israelitt is excluded from the team.

Likewise, by October, almost immediately after he raised his disability request and concerns, Mr. Israelitt was completely excluded from the team meetings. **JA1228**; **JA1239**; **JA1113**; **JA1061.** Incredibly, Mr. Romas sent an e-mail to the team advising them to invite Mr. Israelitt ("JBI" [1]) to technology meetings, **JA566**, but just two days later Mr. Romas did just that – excluding Mr. Israelitt. **JA1228.** Mr. Israelitt fully attended all meetings in August and September before the HP Protect disability issue was raised. *Id.* Mr. Romas claimed for the first time that Mr. Israelitt was not "adapting well." **JA1061.** He further claimed that Jess May, "who was managing the funds for the entire initiative, didn't want to use those funds any longer" – and thus could not bill to the project. *Id.* This is almost like a death knell to working on the project.

But tellingly, there is nothing before the HP Protect disability accommodation request and raising concerns indicating Mr. Israelitt was not "adapting well" and no indication that he could not or should not charge for work on the project. **JA925, at ¶ 10-11.** The first time any issues were raised was *after* Mr. Israelitt revealed his disability at the time of HP Protect.

### f.    Mr. Israelitt satisfactorily performed.

HP claimed that Mr. Israelitt was a deficient performer. However, there were, at the very least, disputes of material fact whether he performed

---

[1] Jeff Kalibjian was often referred to as "JK" and Jeff Israelitt as "JBI." **JA1110.**

satisfactorily. The defense claimed that Mr. Israelitt was "disruptive" in meetings. But that is just not accurate. First, Mr. Israelitt was a full member of the team and meetings right up until HP Protect. A mere couple days after, on September 23 and September 26 Mr. Israelitt is first excluded. **JA1239**; **JA1228; JA1113.** By September 30, 213, less than two weeks after HP Protect when Mr. Israelitt requested an accommodation and when Mr. Israelitt reveals his disability, he is fully and formally excluded from the team meetings. **JA1061-62**.

Setting aside the telling timing of the exclusion from the team, the defense suggested that Mr. Israelitt got along with no one on the team. But that is just not accurate – and at the very least there were disputes of material fact about this. For example, Shaundrae L. Williams, Solution Leader happily noted that she and Mr. Israelitt "are connected at the hip ☺." **JA1220.** Mr. Israelitt's dealings with Chad Teat, and HP co-worker, likewise undercuts the defense theory. In messaging with Mr. Teat concerning his presentation, Mr. Teat clearly appreciated Mr. Israelitt and noted "[y]ou officially need to be our motivational speaker…That was awesome." **JA1229.** *See also* **JA1226** (indicating amicable and good-natured communications with co-workers).

Jeff Kalibjian is an employee of Perspecta, the current HP spin-off entity. **JA1104**. Mr. Kalibjian has a Bachelor of Science in electrical engineering and computer science from UC Berkley and, with a three-month exception, has been

14

employed by HP for the last 19 years. **JA1105-06**. At the times relevant to this case he was a "distinguished technologist" at HP. **JA1107**. Despite Defendant's claim that Mr. Israelitt was somehow disruptive, Mr. Kalibjian, a current HP spinoff employee, indicates that is just not true. **JA1116**. Even Mr. Doty, with an obvious bias against Mr. Israelitt, admits that no one ever told him Mr. Israelitt was disruptive in the scrum meetings. **JA1181**.

In fact, Mr. Romas admitted in his deposition that Mr. Israelitt also had very good relationships with other team members. **JA1079**. Mr. Romas even stated that he got along with Mr. Israelitt. **JA1079**.

Despite being excluded from meetings, Mr. Kalibjian recognized Mr. Israelitt's value to the team, noting his "big time experience." **JA1243**. He suggested to Heath Kinney and Mr. Romas that Mr. Israelitt be invited back to the meetings. Mr. Romas even agreed and instructed Mr. Kinney to "reinvite" Mr. Israelitt to daily meeting calls so he could "keep abreast of team status." *Id.* Mr. Kalibjian expounded on this in his deposition, stating Mr. Israelitt should be included. **JA1118.**

By way of further example, on October 15, 2013, Mr. Israelitt observed that the company was paying over $100,000 it should not have been, discussed training and goals, and other items. Far from Mr. Romas telling Mr. Israelitt he is simply

wrong or should be engaged in other concerns, he observed it was a "good comment." **JA1230**.

Moreover, on September 5, 2013 Mr. Israelitt, along with other team members, was recognized by Jess May in the category of "Trust & Respect." **JA1222.** On November 22, 2013 Mr. Israelitt was recognized by George Romas in the category of Achievement & Contribution. **JA1224**.

On or about October 21, 2013 Mr. Israelitt was the one selected to "briefing [ ] the team" on Engineering and Architecture (E&A) and "help inform the team of our approach and how it will improve lab products." **JA1231.** Mr. Kalibjian was impressed with Mr. Israelitt and thought he had a "solid strategy." **JA1231**; **JA1115**. Mr. Kalibjian attended and observed that the points were "salient and appropriate." *Id.*

On November 28, 2013 Mr. Israelitt prepared a draft write-up on the scoping of a Technology Roadmap to be prepared by Mr. Israelitt and Mr. Kalibjian. Mr. Israelitt delivered a copy to Mr. Romas and Mr. Kalibjian. Mr. Kalibjian recognized that it was "great work" and an "[o]utstanding paper." **JA1237; JA1122-23.** Even after Ms. May and Mr. Romas effectively removed Israelitt from the team, Mr. Kalibjian still recognized Mr. Israelitt's value to the team, noting he has "full confidence your great God given skill set will 'right things' very quickly in 2014!" **JA1238.**

On a scale of 1 to 5, **JA1159**, in the purported performance review, Mr.

Israelitt received an average rating of 3.86 out of 5. **That *exceeds* expectations**.

In fact, the review itself indicates that Mr. Israelitt has "extensive experience and

expertise," the purported issues claimed by Mr. Romas "have mostly been

resolved." **JA745**.[2]

### g. After raising a second request for accommodation with respect to his disability, Mr. Israelitt is retaliated against and excluded from a team-building and product workshop trip to St. Augustine, FL.

Jess May planned a team-building exercise to St. Augustine, Florida.

**JA1063**. The trip was to be charged to HP's DHS account. *Id*. Mr. Israelitt, who

was originally expected to attend the event, expressed his concern about mobility

issues and moving around St. Augustine. **JA929, at ¶31; JA931, at ¶39**; **JA957;**

**JA992-995**. Mr. Israelitt was informed HP was obtaining rental vehicles. Given

the issues with HP Protect, he wanted mobility matters to be easily and simply

resolved. He had a simple request to assist in his mobility: simply add him as an

*additional* driver in the event there are no drivers to go from place to place.

**JA929, at ¶31; JA931, at ¶39**; **JA957; JA992-995**. Mr. Romas claimed that he

simply "can't recall" if Mr. Israelitt expressed concern about getting around and

traveling and simply requested to be added as an additional driver. **JA1064.** It is

---

[2] The performance review purports to state that Mr. Israelitt would be mentored, counseled, and provided communication training. Mr. Romas admitted he did not do so. **JA1078-79**.

undisputed that HP made no attempts to accommodate Mr. Israelitt's simple request or engage in the interactive process in any way.

Defendant's response was swift and crushing. Mr. Israelitt was simply kicked off the trip and completely excluded. **JA929, at ¶31; JA931, at ¶¶39-41**. Mr. Romas claimed that Jess May made the decision to exclude Mr. Israelitt on the team-building trip. **JA1065**. Ms. May's directive on December 19, 2013, in direct response to Mr. Israelitt's raising his disability was to "not charge the DHS account code anymore." **JA1244.** That was effectively the death knell to his work on the project and rendered Mr. Israelitt as simply overhead.

There were important team-building exercises, notable sessions on 2014 planning, architecture, future tools, and roadmaps. **JA1247-72** Indeed, multiple sessions specifically involved technology roadmaps and the very products and initiatives Mr. Israelitt was supposed to be working on. Mr. Romas acknowledged the trip helped in team building and the breakout sessions were helpful and informative. **JA1068-69**.

> **h.     The first business day after the St. Augustine, FL event, Mr. Israelitt is issued a false performance warning, his workload increased, deadlines tightened to near-impossible levels, and terminated shortly after.**

On the first business day following the business trip where HP was working on team-building and even roadmaps, Mr. Romas issued Mr. Israelitt a performance improvement warning. **Ex. 3, Romas Depo., at 83-84**.

18

Mr. Romas testified that he alone made the decision to issue a performance warning to Mr. Israelitt. **JA1082.** He did so on the first business day after returning from the St. Augustine team building and breakout session trip. **1083.** According to Mr. Romas, he has no explanation and doesn't even know why he decided to issue it on January 13, 2014. **JA1082.** In his deposition, Mr. Romas testified that he does not recall if he was considering issuing it earlier, decided on that day to issue it, or something else. **JA1082.** **While issuing the performance warning on January 13, 2014 – just a few weeks after Mr. Israelitt raised concerns about his disability in mid-December 2013 – would be bad enough, at trial, Mr. Romas made a powerful admission tightening the timeline even further: he testified that he started preparing the performance warning "several weeks before [he] actually" issued it. JA331**. *In other words, he started preparing for the performance warning immediately after Mr. Israelitt reminded him of his disability and asked for an accommodation in mid-December 2013.* Mr. Romas himself makes clear the discriminatory and retaliatory animus here.

According to Mr. Romas, the performance warning was issued because of unspecified "performance issues with Jeff producing deliverables" and "The – the issue with – his initial issue with the daily scrum meetings." **JA1081.** Aside from the vague "performance issues" discussed above, the issue with the "daily scrum

meetings" is specious.  As noted above, Mr. Israelitt was simply not disruptive in the meetings.  Moreover, as discussed above, Mr. Israelitt had been removed from the daily team meetings months earlier – by September 23, 2013 and certainly by October 1, 2013.  It simply makes no sense to out of the blue, months later, issue a performance warning based in part on "his initial issue with the daily scrum meetings."

In accordance with the performance warning, Mr. Romas directed that Mr. Israelitt was required to complete the technology roadmap of areas 5-15 by February 12, 2014.  **JA1081-82.**  Interestingly, Mr. Romas was requiring Mr. Israelitt to create a major technology roadmap that involved products he was excluded from reviewing and learning at HP Protect, and create the roadmap despite being excluded from the road mapping breakout sessions in the St. Augustine trip.  He also required Mr. Israelitt to maintain acceptable levels of performance in all other areas of his work.  **JA1082.**  Broadly, a technology roadmap views available technology, products, capabilities, and future technologies in development years down the line.  **JA1068.**  This was a clear set up for termination.

Before the performance warning, the areas 5-15 technology roadmap was a job that was assigned to two people – *both* Jeff Kalibjian and Jeff Israelitt.  **1275.**

This made sense since it is a large project and Mr. Kalibjian was the area 5-15 architect. **JA1274**.

Mr. Romas, while he couldn't recall if the original due date was October 31, 2014, admitted that until his performance warning, it was a "longer term project." **JA1084.** HP's own internal records indicate that this two-person project was anticipated to take over a year. **JA1275; JA1291**. According to the HP's own internal records, the Technology Roadmap was a long-term project that was due by October 31, 2014:

| Goal | Description | Supports | Status | Due Date |
|---|---|---|---|---|
| CM TR framework | Successfully complete CM Technology Roadmap framework and continue to keep the content current | | | 10/31/2014 |

**JA1291.** Defendant's designee confirmed that employee data is contained and maintained in this system by the company and those with editing access are "quite limited." **JA1168; JA1170; JA1173.**

The technology roadmap was initially worked on by Mr. Romas and Mr. Kalibjian. **JA1070.** This project was of such a nature that in just areas 1 through 4, Mr. Romas and Mr. Kalibjian, working together completed only about "50 percent" of it. **JA1072.** According to both the performance warning and Mr. Romas' testimony, Mr. Israelitt was also required to complete all his other tasks satisfactorily.

Mr. Romas claimed he terminated Mr. Israelitt for failing to complete the area 5-15 technology roadmap.[3]  However, as noted above, this is a major task that, both Mr. Kalibjian and Mr. Romas struggled to complete.  **JA1070; 1072.**  Moreover, a "team" of HP personnel had trouble completing a similar project over the course of months before Mr. Israelitt was hired.  **JA923-24, at ¶3.**  Mr. Kalibjian recognized that creating a roadmap is a "big task."  It also often involves multiple people, often over a large amount of time, and the duration could span more than a few months.  **JA1126-27.**  Under these conditions, there is little wonder Mr. Israelitt was unable to complete the project alone, during this time frame, and while also satisfactorily completing all of his other work.

Incredibly, and perhaps for this reason, at trial, Mr. Romas reversed course and claimed that, contrary to the performance warning, Mr. Israelitt did *not* need to complete the project – he only had to show "some progress."  **JA420.**  But he also admitted that Mr. Israelitt did make some progress because he was able to complete some of the task areas even in the shortened timeframe.  **JA421.**

Mr. Romas made the decision to terminate Mr. Israelitt's employment because of his lack of productivity during the performance improvement plan –

---

[3] Strangely, at trial, Mr. Romas claimed that, contrary to the performance warning, Mr. Israelitt did not need to complete the project – he only had to show some progress.  But he also admitted that Mr. Israelitt did show some progress because he was able to complete some portions of it in the shortened timeframe.  **JA420-21.**

22

specifically Mr. Israelitt not completing the technology roadmap that Mr. Romas demanded. **JA1084-85.**

### e.    The District Court's Rulings.

Upon the defense's motion for summary judgment, on March 2, 2021 the District Court granted the motion with respect to the ADA discrimination, failure to accommodate, and hostile work environment claims but denied the motion with respect to the ADA retaliation claims. **JA 30-53**. Upon the defense's request just weeks before trial (long after this matter had been set for a jury trial with the consent of all parties, *e.g.* ECF No. 73-1, at 1), on February 7, 2022, the District Court struck the jury demand ruling that the matter would proceed with a bench trial. **JA54-61**. The remaining claim, for ADA retaliation, was tried by bench trial on February 14-15, 2022. The Court issued a Memorandum of Decision and Order of Judgment in favor of Defendant on March 7, 2022. **JA 62-81**. This timely appeal followed on April 6, 2022. **JA 82**.

## SUMMARY OF ARGUMENT

This Court, along with Courts from around the country, have recognized that the remedies for ADA retaliation claims are identical to the Title VII remedies. Nevertheless, based on two unreported decisions of this Court from 2004, both of which only cited to a single 2004 Seventh Circuit case, the District Court held that compensatory damages and a jury trial are unavailable in an ADA retaliation case.

Courts from around the country are divided on this issue and the Seventh Circuit's analysis is incorrect. Indeed, the ADA is a remedial statute entitled to broad interpretation. And importantly, when examining the statutory scheme as a whole and in context, it is clear that, just as this Court and others have indicated, the Title VII remedies are the remedies applicable to an ADA retaliation case. In fact, a straight line can be drawn from each of the statutes. Based on a plain language reading of the statute, the statute's purposes, and the remedial nature of it, compensatory damages and a jury trial are available.

On summary judgment, the trial court applied an incorrect standard in granting the defense's motion for summary judgment on Plaintiff's ADA discrimination claims. Specifically, the District Court incorrectly applied the pre-2008 statutory and regulatory scheme and did not apply the ADAAA amendments to the ADA. The District Court applied a prior version of the regulations and largely relied on superseded, pre-2008 case law. Moreover, the District Court incorrectly held that intermittent disabilities are not substantially limiting under the ADA – but that is incorrect under the 2008 amendments and current regulatory scheme. Finally, in doing so, the District Court construed the inferences in favor the defense and against the Plaintiff, which is contrary to the governing standard.

In both its summary judgment opinion and in its decision following the bench trial, the trial court erroneously limited its consideration of adverse actions

to termination and not other materially adverse actions.  Such actions include

tightened deadlines, increased workloads, or anything which might have dissuaded

a reasonable worker from making or supporting a charge of discrimination.

Finally, in its Memorandum of Decision, the trial court relied on a

documents that was not offered into evidence at trial and, in any event, was

inadmissible.

## ARGUMENT

### I.    Standard of Review.

#### a.    Statutory Interpretation and Questions of Law.

Questions of statutory interpretation are questions of law that are reviewed

*de novo*.  *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242–43 (4th Cir.

2009).

#### b.    Motion for Summary Judgment.

In reviewing a grant of summary judgment, this Court applies "*de novo* the

same standard that the district court was required by law to apply for granting the

motion for summary judgment."  *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810,

817 (4th Cir. 1995); *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381,

385 (4th Cir. 2013).  "Summary judgment is justified if 'there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law.'" *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

In ruling upon a motion for summary judgment, the Court must view "the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Garofolo v. Donald B. Heslep Assocs.*, 405 F.3d 194, 198 (4th Cir. 2005). *See also Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014) (evidence must be viewed in the light most favorable to the nonmoving party). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, "under Fed.R.Civ.P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not be in admissible form; the requirement is that the party identify facts that could be put in admissible form." *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546 (D. Md. 2013).

## II.     Discussion of the Issues.

### a.     The District Court erroneously ruled compensatory damages and a jury trial are unavailable in ADA retaliation claims as a matter of law.

Upon the defense's request just weeks before trial (long after this matter had been set for a jury trial with the consent of all parties, *e.g.* ECF No. 73-1, at 1), on February 7, 2022, the District Court struck the jury demand ruling that the matter would proceed with a bench trial. **JA54-61**. The basis for the District Court's ruling was two unreported decisions of this Court issued two months apart in 2004. Both opinions simply cited to a Seventh Circuit opinion as the only authority on this issue. The first of those cases involved a *pro se* litigant and informal briefing, and neither of the opinions engaged in any analysis, review of the statutory scheme, or discussion of the conflicting authorities. This case would be the first for this Court to engage in the statutory interpretation necessary to decide this issue. Therefore, a careful review of the statutory scheme is required.

The first applicable case in this Court was decided upon a *pro se* plaintiff's appeal and informal briefing. *Rhoads v. F.D.I.C.*, 94 F. App'x 187, 188 (4th Cir. 2004) (unpublished) (Case No. 03-2373). There, the entire analysis was as follows: "Rhoads' claim that she was entitled to recover compensatory and punitive damages in her trial for violation of the ADA's anti-retaliation provision fails because such relief is unavailable. *Kramer v. Banc of Am. Sec.,* 355 F.3d 961, 965 (7th Cir.2004). Thus, Rhoads' claim that the district court erred in limiting her evidence to prove these damages also fails." *Id.* The Court did not engage in the statutory analysis.

27

Two months later, in another 2004 unreported case, *Bowles v. Carolina Cargo, Inc.*, 100 F. App'x 889, 890 (4th Cir. 2004) (unpublished), the entirety of the analysis was as follows: "On appeal, Bowles' sole issue is that he was entitled to a jury trial on his retaliation claim under 42 U.S.C. § 12203 (2000). We find this claim to be without merit. *See Kramer v. Banc of Am. Sec.,* 355 F.3d 961, 964-66 (7th Cir.) (holding that because an ADA retaliation claimant is limited to equitable relief, he is not entitled to a jury trial), *petition for cert. filed,* 542 U.S. 932, 124 S.Ct. 2876, 159L. Ed.2d 798, 72 U.S.L.W. 3674 (Apr. 16, 2004) (No. 03-14). Accordingly, we affirm." This Court has not revisited this issue since.

*Rhoads* and *Bowles* are unpublished, have no precedential weight, and citation to them are "disfavored" – particularly since they are pre-2007 unpublished cases. *See* Fourth Circuit Local Rule 32.1. *See also Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) (unpublished Fourth Circuit cases have no "precedential weight"). *Rhoads* and *Bowles*, and every case disallowing jury trials in ADA retaliation claims, all rely on the Seventh Circuit decision in *Kramer*. Therefore, Defendant's entire argument to strike Plaintiff's jury demand rises or falls with that case.

The entire basis for the Seventh Circuit's decision in *Kramer* is statutory silence in that § 1981a did not specifically reference ADA retaliation:

> However, the 1991 Civil Rights Act, 42 U.S.C § 1981a (a)(2), expands the remedies available under § 2000e–5(g)(1) in certain

28

circumstances, to provide for compensatory and punitive damages. Specifically, § 1981a(a)(2) provides, in pertinent part, that:

> [i]n an action brought by a complaining party ... against a respondent who engaged in unlawful intentional discrimination ... under ... section 102 of the [ADA] or committed a violation of section 102(b)(5) of the [ADA], against an individual, the complaining party may recover compensatory and punitive damages ....

42 U.S.C. § 1981a(a)(2)

*Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964–65 (7th Cir. 2004) (alterations in original). *Id.* at 965 ("Because claims of retaliation under the ADA (§ 12203) are not listed, compensatory and punitive damages are not available for such claims."). In sum, the entire rationale of *Kramer* is that since Section 1981 is silent on ADA retaliation claims, it is inapplicable to them. *See Rumler v. Dep't of Corr., Fla.*, 546 F. Supp. 2d 1334, 1342 (M.D. Fla. 2008) (discussing and rejecting *Kramer*, 355 F.3d at 965-66 (alterations in original)). *Kramer's* conclusion that statutory silence is dispositive (or that the statute here is silent at all) is simply incorrect.

The Supreme Court has observed that statutory silence "normally creates ambiguity. It does not resolve it." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). In fact, the ADA has a "broad remedial purpose." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 573 (4th Cir. 2015). Remedial statutes "must be given a broad interpretation to effect its ameliorative goals." *First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 867 (4th Cir. 1989);

29

*Scarborough v. Atl. Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1949)

("Remedial statutes should be liberally construed and should be interpreted (when

that is possible) in a manner tending to discourage attempted evasions by

wrongdoers. And unless the statute so requires with crystal clarity, it should not be

so applied as to negative broad principles well settled in our law by a long series of

decisions."). Silence and (at best) a lack of clarity cannot possibly satisfy the

"broad interpretation" necessary to effect the ADA's ameliorative goals. It is

certainly not "crystal clear."

While some courts have followed the analysis in *Kramer*, many courts that

have traced the statutory construction have disagreed given the wholly interrelated

nature of the ADA retaliation remedies and Title VII remedies. Therefore,

following the Supreme Court's directive, the Court should examine the statutory

language "in light of context, structure, and related statutory provisions." *Exxon*

*Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 558 (2005); *Robinson v. Shell Oil*

*Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language

is determined by reference to the language itself, the specific context in which that

language is used, and the broader context of the statute as a whole."). Therefore, a

careful analysis of the statutory scheme is required. Indeed, this Court should do

so with an eye towards "broad interpretation" to effect the statute's "broad

remedial purpose." *Jacobs*, 780 F.3d at 573; *First United Methodist Church of Hyattsville*, 882 F.2d at 867.

The ADA clearly prohibits retaliation:

> **(a) Retaliation**
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).  However, the anti-retaliation provision contains no specific enforcement mechanisms of its own.  Instead, it adopts the remedies for violations of Sections 12117, 12133, and 12188.

> **(c) Remedies and procedures**
> The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively.

42 U.S.C. § 12203(c).  Section 12117 then specifically incorporates the remedies of Title VII:

> **(a) Powers, remedies, and procedures**
> The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117 (incorporating sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, 2000e-9).  Section 1981, 42 U.S.C. § 1981a authorizes compensatory and punitive damages under Section 12117, 42 U.S.C. § 12117.

Synthesizing these statutes together, the Eastern District of New York in a reported opinion summarized:

> In the employment discrimination context, the retaliation provision in the ADA refers the reader to 42 U.S.C. § 12117 for its remedy, which in turn adopts the remedies set forth in Title VII, specifically 42 U.S.C. § 2000e–5 and 42 U.S.C. § 1981a(a)(2). *See id.* § 12117. Thus, the remedies for violations of § [12203] of the ADA and § 12117 of the ADA are coextensive with the remedies available in a private cause of action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. Under the Civil Rights Act of 1991, employees who prevail on a claim under Title I of the ADA may recover compensatory and punitive damages and demand and receive a trial by jury. *See* 42 U.S.C. § 1981a(a)(2).

*Edwards v. Brookhaven Sci. Assocs., LLC*, 390 F. Supp. 2d 225, 235 (E.D.N.Y. 2005).  Thus, under the applicable language of the ADA itself, the same remedies are available for retaliation claims as for claims under provisions generally prohibiting discrimination.

Critically, in a reported decision, **this Court has specifically recognized that the Title VII remedies are applicable to ADA retaliation claims**:

> The remedies available for a violation of the antiretaliation provision of the ADA in the employment context are set forth in 42 U.S.C.A. § 12117 (West 1995). *See* 42 U.S.C.A. § 12203(c).[11] Section 12117 specifically makes the remedies available under Title VII applicable to actions under the ADA. *See* 42 U.S.C.A. § 12117(a) (providing that "[t]he powers, remedies, and procedures set forth in section[ ] ...

> 2000e–5 ... of this title shall be the powers, remedies, and procedures
> this subchapter provides to ... any person alleging discrimination on
> the basis of disability").''

*Baird v. Rose*, 192 F.3d 462, 471–72 (4th Cir. 1999). *See also Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, 956 F. Supp. 2d 695, 707 (E.D. Va. 2013) ("'The ADA borrows remedies from Title VII for retaliation claims in the employment context. *See* 42 U.S.C. §§ 12203, 12117, 2000e–5. The Court's discussion of back pay[, front pay, and punitive damages] in Title VII actions .... then, is directly applicable to this case.'") (alteration in original) (quoting *Rhoads v. F.D.I.C.*, 286, F. Supp. 2d 532, 537 n. 2 (D. Md. 2003)). This Court has further recognized the "parallel nature" of the ADA and Title VII remedies: "For in the ADA itself Congress evidenced its knowledge of, and reliance on, the parallel nature of the two statutes, providing that 'the powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [the ADA] provides.' 42 U.S.C. § 12117(a)." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001). *See also A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 362 (4th Cir. 2008) ("Moreover, because the ADA 'echoes and expressly refers to Title VII, and because the two statutes have the same purpose,' courts confronted with ADA claims have also frequently turned to precedent under Title VII.").

Similarly, the D.C. Circuit, six years after *Kramer*, has noted that

"[i]n *Steele v. Schafer*, we confronted this issue in the context of an action brought

under **Title VII of the Civil Rights Act, which contains anti-discrimination and**

**anti-retaliation provisions that are indistinguishable from those of the**

**ADA**. 535 F.3d 689, 695 (D.C. Cir. 2008)." *Mogenhan v. Napolitano*, 613 F.3d

1162, 1165-66 (D.C. Cir. 2010) (emphasis added) (denying summary judgment on

ADA retaliation claim because a jury could believe Plaintiff's claims).  The Sixth

Circuit has flatly stated "[r]etaliation claims are treated the same whether brought

under the ADA or Title VII." *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).

The Eleventh Circuit has likewise noted that Section 12203 "creates a prohibition

on retaliation under the ADA that is similar to Title VII's prohibition on

retaliation. Accordingly, we assess ADA retaliation claims under the same

framework we employ for retaliation claims arising under Title VII." *Stewart v.*

*Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).  *See*

*also Baumgardner v. County of Cook*, 108 F.Supp.2d 1041, 1044–45

(N.D.Ill.2000) (tracking legislative history concluding that if the powers, remedies,

and procedures change in Title VII, they will concurrently change for the ADA).

Given that this Court has recognized that the Title VII remedies are

applicable to ADA retaliation claims, the analysis of the numerous courts

disagreeing with *Kramer* are fully applicable in the Fourth Circuit.

For example, in *Edwards*, the Eastern District of New York disagreed with

the *Kramer* analysis and viewed the statutory scheme as a whole, holding that

compensatory damages and a jury trial are available in retaliation claims:

> The Seventh Circuit's analysis makes it clear that § 1981(a)(1)
> does not list § 12203 as a claim that permits recovery of compensatory
> damages. However, "[n]o sound canon of interpretation requires
> Congress to speak with extraordinary clarity...." *Exxon Mobil
> Corp.,* 125 S.Ct. at 2620, 162 L.Ed.2d 502. **The statute must be read
> in conjunction with and "in light of [the] context, structure, and
> related statutory provisions."** *Id.* **In the Court's view, the omission
> of § 12203 in § 1981 is of no consequence when § 1981 is read in
> conjunction with the relevant provisions of the ADA. As stated
> above, the retaliation provision of the ADA contains no remedy of
> its own. Rather, it is clear that the "remedies and procedures ...
> available to aggrieved persons" for violations of § 12203 are
> the *same* as the "remedies and procedures available under" Title I
> of the ADA.** *Id.* Considering that the remedies available for retaliation
> under the ADA are commensurate with those available under Title I, it
> was unnecessary for Congress to separately mention retaliation in §
> 1981. Thus, it is fair to assume that the expansive effect of § 1981(a)
> applies equally to claims under Title I as it does to retaliation claims
> by virtue of the fact that the remedies available for retaliation claims
> incorporate, and are coextensive with, the remedies available under
> Title I.
>
> Therefore, the Court finds that compensatory damages may be
> awarded on claims of retaliation under the ADA as they are in Title I.
> This conclusion is consistent with the "well settled" rule that "where
> legal rights have been invaded, and a federal statute provides for a
> general right to sue for such invasion, federal courts may use any
> available remedy to make good the wrong done." *Barnes v.
> Gorman,* 536 U.S. 181, 189, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002)
> (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939
> (1946)). "The purpose of awarding damages in employment
> discrimination cases is to make the victim 'whole for injuries suffered
> on account of unlawful employment discrimination.' " *Greenway v.
> Buffalo Hilton Hotel,* 143 F.3d 47, 54 (2d Cir.1998)

(quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Case law makes clear that "[r]etaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361 (2005). **Accordingly, the Court finds that it is appropriate to allow compensatory damages and a jury trial for retaliation claims under the ADA**.

*Edwards v. Brookhaven Sci. Assocs., LLC*, 390 F. Supp. 2d 225, 236 (E.D.N.Y.

2005) (alterations in original).

In *Rumler*, the Middle District of Florida reached the same conclusion when

viewing the statutory scheme as a whole – and not isolated to a single provision:

Upon review of the relevant provisions of the ADA, the Civil Rights Act of 1964, and the 1991 amendments, as well as the persuasive analysis of other courts, this Court finds that the remedies for employment retaliation under Title V of the ADA are coextensive with the remedies for employment discrimination under Title I. **As § 12203 adopts the remedies of § 12117, a plaintiff claiming retaliation under the ADA in the employment context has the right to the same remedies and procedures available to a plaintiff alleging intentional employment discrimination. Those remedies are set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, as amended. It is not significant that Congress did not reiterate this link in the 1991 amendments. To do so would have been redundant as § 12203 already provided that plaintiffs claiming retaliation in the employment context could avail themselves of the same remedies as plaintiffs claiming discrimination under Title I**. Indeed, courts "must presume that Congress said what it meant and meant what it said." *Shotz,* 344 F.3d at 1167 (quoting *U.S. v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc)). When Congress expanded the relief available under § 12117 to include legal damages, it also expanded the relief available under § 12203 by reference. **Accordingly, the Court finds that Plaintiff is entitled to seek compensatory and punitive**

36

> **damages, and entitled to demand a trial by jury on her ADA retaliation claim**.

*Rumler v. Dep't of Corr., Fla.*, 546 F. Supp. 2d 1334, 1342–43 (M.D. Fla. 2008).

Additionally, the *Kramer* decision was issued four years before the Supreme Court's decision in *Gómez–Pérez v. Potter*, 553 U.S. 474 (2008). In *Baker v. Windsor Republic Doors*, (W.D. Tenn. 2009), *aff'd*, 414 App'x 764 (6th Cir. 2011), an employee alleged discrimination and retaliation under the ADA and the employer claimed compensatory damages and a jury trial were unavailable. *Id.* at 766. The court, discussing the Supreme Court's decision in *Gómez–Pérez*, held that under the ADA, retaliation "is supported by both the explicit prohibition at § 12203 and the implicit prohibition at § 12112." *Id.* at 768-71. The court concluded:

> Application of *Gomez–Perez* to the facts of this case requires the conclusion that the verdict in favor of Baker's retaliation action is supported by both the explicit prohibition at § 12203 and the implicit prohibition at § 12112. Because § 1981 a(a)(2) undisputably permits a compensatory award for violations of § 12112, it would be an absurd result to hold that Congress intended compensatory damages to be available only under § 12112 and not § 12203—considering that these statutes codify identical causes of action for retaliation. Thus, the Court holds that § 1981a(a)(2) extends compensatory damages to ADA retaliation claims, and the jury's award of $29,500 to Baker will be sustained.[10]

*Baker*, 635 F. Supp. 2d at 771. Thus, in fairness to *Kramer* and the unreported decisions of this Court, they did not have the benefit of additional guidance from

the Supreme Court in *Gomez-Perez* issued four years later, which presents an additional tool militating in favor of compensatory damages and a jury trial.

These courts are not alone in concluding compensatory damages and a jury trial are available. Cases similarly holding include *Aguirre v. City of Miami*, No. 04-23205-CIV, 2007 WL 9701708, at *2 (S.D. Fla. July 18, 2007) (finding Plaintiff is entitled to a jury trial in ADA retaliation case and stating "[a]fter looking to sound principles of statutory interpretation and case law, we are swayed by the Eastern District of New York's thoughtful rationale and analysis in *Edwards*"); *Mueller v. Rutland Mental Health Servs., Inc.*, No. 1:05-CV-38, 2006 WL 2585101, at *5 (D. Vt. Aug. 17, 2006) (agreeing with *Edwards*).

Additionally, both the Fifth and Eleventh Circuit maintain Pattern Jury Instructions for ADA retaliation claims. *See* Fifth Circuit Pattern Jury Instructions (Civil Causes) § 11.11 available at

https://www.lb5.uscourts.gov/juryinstructions/fifth/2020civil.pdf; Eleventh Circuit Pattern Jury Instructions § 4.22, at 8, available at

http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCivilPatternJuryInstructionsCurrentComplete.pdf?revDate=20200227.

Further, although not independently examining whether such damages are available under the act, the Second, Eighth and Tenth Circuits have affirmed awards of compensatory damages in ADA retaliation cases. *See Muller v.*

*Costello,* 187 F.3d 298, 315 (2d Cir.1999); *Foster v. Time Warner Entertainment Co.,* 250 F.3d 1189, 1196–98 (8th Cir. 2001); *Salitros v. Chrysler Corp.,* 306 F.3d 562, 577 (8th Cir. 2002); *EEOC v. Wal–Mart Stores, Inc.,* 187 F.3d 1241, 1249 (10th Cir. 1999).

Buttressing the straightforward statutory analysis, concluding that the remedies for Title VII are applicable to an ADA retaliation claim make great sense in any event because retaliation claims are, effectively, discrimination claims. As noted above, in *Gómez–Pérez,* a government employee brought a claim against her employer for retaliation under the Age Discrimination in Employment Act ("ADEA"). 553 U.S. at 477. The Supreme Court held that statutory provisions prohibiting discrimination also prohibit retaliation. 553 U.S. at 481. Likewise, "[c]ase law makes clear that retaliation is, by definition, a form of discrimination because the complainant is subjected to differential treatment. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173–74 (2005)." *Stamper v. Kaiser Found. Health Plan of the Nw.*, No. 08-6335-HO, 2010 WL 2720708, at *5 (D. Or. July 7, 2010).

The statutory scheme as a whole makes plain that the Title VII remedies are applicable to ADA retaliation claims. At best, there is simply a lack of clarity. But a lack of clarity cannot serve to limit the broad remedial purposes of the ADA – particularly where a straightforward reading of the statutory scheme makes the

remedies applicable. Therefore, compensatory damages and a jury trial are available in an ADA retaliation claim and this matter should be remanded to the District Court for a jury trial.

> **b.    The District Court erroneously dismissed Plaintiff's ADA discrimination claims on summary judgment and applied the wrong legal standards.**

At the summary judgment stage, the District Court dismissed Plaintiff's ADA discrimination claims. However, there were sufficient facts at summary judgment to send the ADA issues to the jury. Additionally, the District Court applied superseded regulations and case law, which preceded the 2008 amendments under the ADAAA.

"To establish a claim for disability discrimination under the ADA, a plaintiff must prove '(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).

Similarly, to state a claim for a wrongful discharge under the ADA, This Court has explained:

> In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate

expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995). One is within the ADA's protected class if one is "a qualified individual with a disability." 42 U.S.C.A. § 12112 (West 1995). The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C.A. § 12102(2) (West 1995).

*Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702-03 (4th Cir. 2001).

Under the ADA Amendments Act of 2008 ("ADAAA"), the standards under the ADA were significantly relaxed. Whether one is qualified with a disability is considerably less exacting than pre-ADAAA version of the statute:

"In September 2008, Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553...." *Summers v. Altarum Inst., Corp.,* 740 F.3d 325, 329 (4th Cir.2014). The ADA Amendments Act (ADAAA) was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Id.* "[T]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub.L. No. 110–325, § 2(b)(5) (2008). In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw. *Summers,* 740 F.3d at 331.

*Jacobs*, 780 F.3d at 572. [4] The level of impairment under the ADA is not particularly onerous following the ADAAA:

---

[4] Therefore, pre-ADAAA cases are largely irrelevant in examining whether one qualifies with a disability.

> The regulations define a substantially limiting impairment as one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).[12] **"An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."** *Id.*

*Jacobs*, 780 F.3d at 573 (footnote omitted) (emphasis added).

The renders Mr. Israelitt as qualified individual with a disability. Here, Mr. Israelitt suffers from a disability. Among other issues he suffers from a condition in his foot – hallux rigiditis. **JA1185-87.** He has degenerative changes in the right first metatarsophalangeal joint and right great toe. *Id.* Mr. Israelitt also had at least two cheilectomies in 1993 and 1997. *Id.* He currently has, and at all relevant times had, State of Maryland disability placards as a result of his condition. **JA1021; 1188-93**.

Mr. Israelitt's condition is so significant that, at times, he "can barely walk" because of the pain. **JA1014.** It is "extremely painful" and causes "[p]artial loss" of use of the foot. **JA1015-16.** The toe problem even affects his ability to dress or bathe himself. **JA1017.** Tellingly, on summary judgment, Defendant's designee, when asked whether Defendant is challenging Mr. Israelitt's disability in this litigation simply stated "I don't think it's HP's position to make a declaration about his medical status and actual disability status." **JA1155-56.**

The trial court made at least two critical errors of law.

First, as discussed above, the ADAAA significantly changed the ADA. The District Court erroneously emphasized four times that it was requiring Mr. Israelitt to show "significant" impairment. **Memorandum Opinion, JA39-40**. In fact, the District Court cited the old, superseded regulatory definition of "substantially limits." The District Court wrote that "'Substantially limits' is defined as "significantly restricted as to the condition, manner or duration to the condition, manner, or duration under which the average person in the general population can perform that some major life activity," or the inability "to perform a major life activity that the average person in the general population can perform.' 29 C.F.R. § 1630.2(j)(l)(ii)." **Memorandum Opinion, JA 39**. That is not the standard. **That definition was superseded and the current definition is far more forgiving for Plaintiffs**. The current regulation provides:

> (j) Substantially limits—
> ***
> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.
> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.
> ***

29 C.F.R. § 1630.2(j).  Thus, the District Court plainly applied the wrong

regulation and the wrong standard so erred as a matter of law.  In fact, the majority

of cases cited by the District Court were all pre-2008 cases and thus pre ADAAA

and largely irrelevant to the analysis.

Second, the District Court also took the incorrect view that because Mr.

Israelitt can *at times* walk, he is not a qualified individual with a disability.  To do

so, the District Court erred in at least two additional respects.

Initially, the court did not construe the facts in the light most favorable to

Mr. Israelitt.  Indeed, it construed all the inferences against him.  As noted above,

there is evidence in the record that there are times when he can "barely walk," has

"partial loss" of the use of the foot, and even affecting his ability to dress or bathe.

The court ignored this evidence and focused solely on what he could do.  This was

improper on summary judgment and contrary to the governing standard that all

facts and inferences therefrom must be construed in Mr. Israelitt's favor.

*Anderson*, 477 U.S. at 255.

Moreover, the court did not apply the ADAAA regarding episodic

limitations.  Whether Mr. Israelitt is *always* severely limited is irrelevant under the

ADA analysis (or more specifically under the ADAAA).  Under the current version

of the statute, the definition of "disability" "shall be construed in accordance with

the following: … (D) An impairment that is episodic or in remission is a disability

if it would substantially limit a major life activity when active.  42 U.S.C. §

12102(4)(D).  Likewise, the frequency or duration are likewise irrelevant.  "Under

the 2008 amendments, '[t]he fact that the periods during which an episodic

impairment is active and substantially limits a major life activity may be brief or

occur infrequently is no longer relevant to determining whether the impairment

substantially limits a major life activity.'"  *Gogos v. AMS Mech. Sys., Inc.*, 737

F.3d 1170, 1173 (7th Cir. 2013) (quoting 29 C.F.R. Pt. 1630, App. at Section

1630.2(j)(1)(vii)).

Even far more temporary and less serious ailments are qualifying disabilities

under the ADA following the ADAAA amendments.  Even a temporary ankle

injury would qualify:

> The court concludes, in light of the stated purpose of the ADAAA to
> broaden the coverage of the ADA (and, thus, the Rehabilitation Act),
> and especially the definition of the phrase "substantially limits," and
> in consideration of the persuasive regulatory provisions interpreting
> the ADAAA, that Congress no longer intends for temporary
> impairments to be excluded from the definition of "disability."
> Plaintiff's ankle injury impairment substantially limited her ability to
> perform the major life activities of standing, walking, running, and her
> general musculoskeletal function. The fact that the limitation was
> temporary is irrelevant.

*Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1261 (N.D. Ala.

2013).

The cases cited by the District Court were either pre-2008 or easily

distinguishable.  The District Court's held Mr. Israelitt was not sufficiently limited

based on an unreported Northern District of West Virginia case where the plaintiff

merely had "some limitation in walking up hills and in the snow." *Frogge v. Fox*,

No. 1:17-cv-155, 2019 WL 2418749, at *6 (N.D.W. Va. June 10, 2019). *See*

**JA40-41**. The only other post-2008 case cited by District Court was *Fink v.*

*Richmond*, 405 Fed. App'x 719 (4th Cir. 2010). But *Fink* was not an ADAAA

case. This Court affirmed that the ADAAA "did not have retroactive effect and,

therefore, did not apply to Fink's case." *Id.* at 722. In any event, the plaintiff in

*Fink* was only limited in walking quickly or for long distances. *Id.* Both *Frogge*

and *Finke* are easily distinguishable. As noted above, there is evidence in the

record that there are times when Mr. Israelitt can "barely walk," has "partial loss"

of the use of the foot, and even affecting his ability to dress or bathe.

Therefore, Plaintiff set forth sufficient evidence at summary judgment that

he is a qualified individual with a disability.

As a final matter, as set forth above, Mr. Israelitt provided sufficient

evidence to generate a jury question whether he was satisfactorily performing.

Prior to his discharge (and prior to exclusion from HP Protect and the St.

Augustine trip), Mr. Israelitt was satisfactorily performing. He received a rating of

3.86, which easily meets expectations and is closer to *exceeding expectations*.

**JA745**; **JA1159**. Other than the times where he raised his disability, Mr. Israelitt

received consistent praise for his work, including on September 5, 2013, **JA1222;**

46

October 21, 2013, **JA1231; JA1115**; November 22, 2013, **JA1224;** and November 28, 2013, **JA1237; JA1122-23** ("great work" and an "[o]utstanding paper").

Likewise, as set forth above, the circumstances raise in inference of discrimination. Indeed, each time Mr. Israelitt raised any issues concerning his disability, he was met with swift and strong resistance. As discussed in detail above, immediately after raising a disability accommodation request with respect to HP Protect Mr. Israelitt was instructed to not attend. All of the individuals identified by HP to attend were able to *except for Mr. Israelitt*. **JA976; JA1176-77.** He was then immediately removed from the team and excluded. When he raised the issue of his disability concerning the disability accommodation request with respect to the St. Augustine trip, HP totally failed the interactive process. Instead, Mr. Israelitt was immediately kicked off the DHS team, was excluded from the trip, and was not permitted to attend the sessions. He was then met with severely tightened deadlines and increased workloads. He was forced to complete a major, multi-person, multi-month project in under 30 days.

Quite simply, every time Mr. Israelitt raised the issue of his disability, significant limitations on his employment ensued. First he was removed from all team meetings, then, when Mr. Israelitt was quiet, he was added back on. Then, when raised his disability again, he was again met with swift adverse action: removed from the billable job he was working on and kicked off the team-building

trip to Florida. Mr. Romas himself makes clear the discriminatory and retaliatory animus here. At "best" the impossible-to-complete performance warning was issued just a few weeks after Mr. Israelitt raised concerns about his disability in mid-December 2013. Even worse, at trial, Mr. Romas made a powerful admission tightening the timeline even further when he testified that he started preparing the performance warning "several weeks before [he] actually" issued it. **JA331**. Thus, by his own admission he started preparing for the performance warning immediately after Mr. Israelitt reminded him of his disability and asked for an accommodation in mid-December 2013.

This conduct by HP certainly gives rise to an "inference of discrimination." Mr. Israelitt set forth a claim for discrimination on summary judgment and this matter should be remanded for a jury trial.

### 1.    HP's reasoning was a mere pretext.

A plaintiff may also survive summary judgment if he can proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation if false or unworthy of credence, and that the discrimination was the true reason for the adverse employment action. *EEOC v. Mfrs. & Traders Tr. Co.*, 402 F. Supp. 3d 201, 234 (D. Md. 2019). "Accordingly, if a plaintiff presents evidence or legitimate argument that could persuade a rational fact finder to disbelieve the defendant's justification for its employment decision, summary

judgment in favor of the employer is not appropriate." *Id.*, at 235. "A plaintiff may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fordyce v. Prince George's County Md.*, 2014 U.S. Dist. LEXIS 117967, *24 (D. Md. 2014) (internal quotation marks omitted) (emphasis added). Likewise, if "a reasonable fact-finder could infer something 'fishy'" about Defendant's claims under the circumstances, it may suggest pretext. *Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 199 (D.D.C. 2015).

Here, Mr. Romas claimed he terminated Mr. Israelitt for failing to complete the area 5-15 technology roadmap. Mr. Romas made the decision to terminate Mr. Israelitt's employment because of his lack of productivity during the performance improvement plan – specifically Mr. Israelitt not completing the technology roadmap that Mr. Romas demanded. **JA1084-85.**

Before the performance warning, the technology roadmap was a job that was assigned to two people *both* Jeff Kalibjian and Jeff Israelitt. *E.g.* **JA924, at ¶ 6**; **JA1275.**

Mr. Romas, while he couldn't recall if the original due date was October 31, 2014, admitted that until his performance warning, it was a "longer term project." **JA1084.** HP's own internal records indicate that this two-person project was

49

anticipated to take over a year. **JA1275; JA1291**.  According to the HP's own

internal records, the Technology Roadmap was a long-term project that was due by

October 31, 2014. **JA1291.**  Defendant's designee confirmed that employee data is

contained and maintained in this system by the company and those with editing

access are "quite limited." **JA1168; JA1170; JA1173.**

The technology roadmap was initially worked on by Mr. Romas and Mr.

Kalibjian. **JA1070.**  This project was of such a nature that in just areas 1 through

4, Mr. Romas and Mr. Kalibjian, working together completed only about "50

percent" of it. **JA1072**.  According to both the performance warning and Mr.

Romas' testimony, Mr. Israelitt was also required to complete all his other tasks

satisfactorily.

However, as noted above, this is a major task that, both Mr. Kalibjian and

Mr. Romas struggled to complete. **JA1070; 1072.**  Moreover, a "team" of HP

personnel had trouble completing a similar project over the course of months

before Mr. Israelitt was hired. **JA923-24, at ¶3.**  Mr. Kalibjian recognized that

creating a roadmap is a "big task."  It also often involves multiple people, often

over a large amount of time, and the duration could span more than a few months.

**JA1126-27.**

Under these conditions, there is little wonder Mr. Israelitt was unable to

complete the project alone, during this time frame, and while also satisfactorily

completing all of his other work.  Not completing the Technology roadmap under these circumstances was clearly pretextual.

As a final matter, and though disclaimed as a basis for the termination, the defense variously claimed that Mr. Israelitt was somehow disruptive during meetings or did not get along with others.  But that is just wrong – and at the very least a jury question.  As displayed above, Mr. Kalibjian, **JA1116**, Mr. Doty, **JA1181**, and Mr. Romas, **JA1079**, all refute this.

Likewise, the suggestion in Defendant's motion that Mr. Israelitt was just generally a poor performer is unworthy of credence.  First, general poor performance was not a basis for Mr. Romas' termination.  Second, as set forth above, prior to his discharge (and prior to exclusion from HP Protect and the St. Augustine trip), Mr. Israelitt was satisfactorily performing.  received a rating of 3.86, which easily meets expectations and is closer to *exceeding expectations*.  **JA745**; **JA1159**.  Other than the times where he raised his disability, Mr. Israelitt received consistent praise for his work, including on September 5, 2013, **JA1222;** October 21, 2013, **JA1231; JA1115**; November 22, 2013, **JA1224;** and November 28, 2013, **JA1237; JA1122-23** ("great work" and an "[o]utstanding paper").

Under the circumstances, Defendant's stated reason – the Technology Roadmap – was an impossible task and obvious set-up for termination.  Its bases for removing Mr. Israelitt from meeting, excluding him, isolating him, and

tightening his deadlines, increasing his workload, and terminating him are riddled with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder could rationally find them unworthy of credence." *Fordyce*, 2014 U.S. Dist. LEXIS 117967, *24.

For this additional reason, a jury question was generated and the ADA claim should have been submitted to a jury.

> **c.  The District Court erroneously held that adverse actions, including removal from meetings, increased workloads, severely tightened deadlines, and being removed from billable work, are not actionable adverse actions.**

On summary judgment, *e.g.* **JA41-42**, and again following trial, **JA77**, the District Court limited its consideration of the adverse actions taken by HP against Mr. Israelitt to his termination. This too was incorrect as a matter of law. As discussed above, in direct response to his raising his disability and/or in retaliation for engaging in the protected conduct of requesting an accommodation, following the HP Protect 2013 request Mr. Israelitt was immediately kicked out of daily meetings. After raising his disability again before the St. Augustine trip, HP totally failed the interactive process. Instead, he was immediately kicked off the DHS team (the only billable client), he was excluded from the trip, and was not permitted to attend the sessions. He was then met with severely tightened deadlines and increased workloads. He was forced to complete a major, multi-person, multi-month project in under 30 days.

The Supreme Court has explained the broad nature of the ant-reprisal provisions of the civil rights laws are very broad: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Therefore, if like here, an employer increases an employee's workload or tightens deadlines, that is sufficiently adverse action. *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010). Thus, even "threats" can constitute retaliatory action – the question simply being whether it holds a deterrent prospect of harm. *Ali v. D.C.*, 697 F. Supp. 2d 33, 52-53. *See also Billings v. Town of Grafton*, 515 F.3d 39, 54-55 (risk of investigation or reprimand suffices).

Therefore, the trial court erroneously limited the analysis of the adverse action to the termination.

> **d.      The District Court relied on evidence not admitted at trial, and which was otherwise inadmissible, in its Memorandum of Decision and Order of Judgment.**

In its Memorandum of Decision, the District Court included lengthy quotes from a "Performance Coaching Template," **JA72-73** (quoting Defense Ex. 36, **JA815-16**. The court appeared to use this exhibit to bolster its conclusion that Mr. Israelitt was a poor performer. However, this document was never admitted into

evidence at trial. Indeed, had it been offered, it would have been inadmissible in any event since it could not be authenticated or shepherded into evidence. Mr. Romas does not remember seeing the document and the first time he recalls seeing it was in the litigation. **JA1088-89**. Therefore, because the trial court relied on evidence not admitted at trial in its opinion, this provides additional bases for a reversal and remand for further proceedings.

## <u>CONCLUSION</u>

Appellant respectfully requests that this Court reverse the decision of the District Court and remand for further proceedings.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellant respectfully requests oral argument. This matter presents a significant issue of first impression in this Court in that it has yet to be decided in a reported opinion, and concerns issues that have significantly divided the courts and relevant authorities around the country. Moreover, this case provides an important opportunity for this Court to set forth and reaffirm the relevant standards under the ADA and ADAAA. Oral argument will assist the Court in deciding and resolving the important issues addressed in the briefs.

Respectfully submitted,

*/s/ Levi S. Zaslow*
Levi S. Zaslow
SMITHEY LAW GROUP LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990 (phone)
(410) 280-1602 (fax)
Levi.Zaslow@smitheylaw.com
*Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as the brief contains 12,977 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

3.      As permitted by Fed. R. App. P. 32(g), the undersigned relied upon the word count of a word-processing system in preparing this certificate.

*/s/ Levi S. Zaslow*
Levi S. Zaslow

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 14, 2022, a copy of the foregoing was filed to be transmitted via this Court's CM/ECF electronic filing system to: all counsel of record in this matter.

*/s/ Levi S. Zaslow*
Levi S. Zaslow
