**CASE NO. 22-1382**

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**JEFFREY B. ISRAELITT,**
Plaintiff-Appellant
**v.**
**ENTERPRISE SERVICES LLC**
Defendant-Appellee

_____

On Appeal from the United States District Court for the District of Maryland
The Honorable Stephanie A. Gallagher, Presiding
Case No. 1:18-cv-01454-SAG

_____

**APPELLEE ENTERPRISE SERVICES LLC'S BRIEF**

_____

Submitted by:

THE KULLMAN FIRM
HEATHER F. CROW (Fla. Bar No. 115437)
2915 Kerry Forest Parkway, Suite 101
Tallahassee, FL 32309
P: 850-296-1953
hfc@kullmanlaw.com

ALLISON A. FISH (La. Bar No. 36456)
1100 Poydras Street, Suite 1600
New Orleans, LA 70163
P: 504-524-4162
F: 504-596-4189
aaf@kullmanlaw.com

**COUNSEL FOR APPELLEE
ENTERPRISE SERVICES LLC**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1382    Caption: Jeffrey B. Israelitt v. Enterprise Services LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Enterprise Services LLC
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?    ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Appellee's name changed to Perspecta Enterprise Solutions LLC, a wholly owned subsidiary of Perspecta HC LLC, a wholly owned subsidiary of Peraton Solutions Inc. (formerly Perspecta Inc.), a subsidiary of Peraton Corp., held through holding companies of two private equity funds, The Veritas Capital Fund V and The Veritas Capital Fund VII, Veritas Capital as general partner.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Heather F. Crow                         Date:              8/15/2022

Counsel for: Enterprise Services LLC

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. ii

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES .................................................................. vi

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF THE CASE ................................................................. 1

I.    Introduction ................................................................................. 1

II.    Statement of Facts ......................................................................... 3

    A.    Israelitt was employed by HP for just over six months. ...................... 3

    B.    Israelitt claims an alleged toe condition. ......................................... 5

    C.    Israelitt raised issues regarding attending HP Protect. ...................... 6

    D.    Israelitt had ongoing performance deficiencies. ................................ 9

    E.    Israelitt did not attend a January 2014 work trip to Florida. ............. 12

    F.    Israelitt received a performance warning and was subsequently terminated. ...................................................................... 14

SUMMARY OF THE ARGUMENT ....................................................... 15

ARGUMENT ...................................................................................... 16

I.    Standard of Review ........................................................................ 16

    A.    Clear Error ............................................................................... 16

    B.    *De Novo* Review ....................................................................... 17

II.    Discussion ................................................................................... 19

    A.    The district court properly found that Israelitt had no right to a jury trial on his ADA retaliation claim. .............................................. 19

        1.    The weight of authority reflects that no jury is available on an ADA retaliation claim. ......................................................... 24

        2.    Even if Israelitt were denied a jury trial, it was harmless error. ............................................................................ 28

    B.    The district court correctly found that Israelitt was not disabled ........ 30

        1.    Even if Israelitt were a qualified individual with a disability, he failed to show pretext. ......................................... 39

iv

C.      The district court correctly applied the *Burlington Northern* standard to alleged actions beyond discharge and correctly determined that they were not adverse. .................................................42

    1.      The Court should affirm the district court's holding because there is a complete absence of animus or causal connection. ...............................................................48

D.      The district court's consideration of an exhibit that was not admitted during the bench trial was harmless error. ...........................48

CONCLUSION ................................................................................................50

STATEMENT REGARDING ORAL ARGUMENT ...........................................51

CERTIFICATE OF COMPLIANCE...................................................................52

CERTIFICATE OF SERVICE ...........................................................................52

# TABLE OF AUTHORITIES

**Cases**

*Alvarado v. Cajun Operating Co.*,
  588 F.3d 1261 (9th Cir. 2009) .......................................................... 22, 24, 26, 27

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985) ...................................................................................... 16, 17

*Arredondo v. S2 Yachts*,
  496 F. Supp. 2d 831 (W.D. Mich. 2007) ............................................................. 27

*Bennett v. Kaiser Permanente*,
  931 F. Supp. 2d 697 (D. Md. 2013) .................................................................... 37

*Billings v. Town of Grafton*,
  515 F.3d 39 (1st Cir. 2008) ................................................................................. 44

*Bowles v. Carolina Cargo, Inc.*,
  100 F. App'x 889 (4th Cir. 2004) ....................................................................... 28

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ............................................................................... 42, 45, 46

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................... 18

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ........................................................................................... 23

*Crespo v. Holder*,
  631 F.3d 130 (4th Cir. 2011) .............................................................................. 23

*Crowell v. Denver Health & Hosp. Auth.*,
  572 F. App'x 650 (10th Cir. 2014) ..................................................................... 33

*Curtis v. Loether*,
  415 U.S. 189 (1974) ........................................................................................... 19

*Dalton v. Lewis-Gale Med. Ctr. LLC*,
  No. 7:19-cv-204, 2019 WL 4394757 (W.D. Va. Sept. 13, 2019) ........................ 28

*Danielle-DiSerafino v. Dist. Sch. Bd. of Collier Cnty., Fla.*,
  756 F. App'x 940 (11th Cir. 2018) ..................................................................... 36

*E.E.O.C. v. Stowe-Pharr Mills, Inc.*,
  216 F.3d 373 (4th Cir. 2000) .............................................................................. 33

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
  187 F.3d 1241 (10th Cir. 1999) .......................................................................... 25

*Edwards v. Brookhaven Science Associates, LLC*,
  390 F. Supp. 2d 225 (E.D.N.Y. 2005) ................................................................ 26

*EEOC v. St. Joseph's Hosp., Inc.*,
  842 F.3d 1344 (11th Cir. 2016)..................................................................37

*Equal Employment Opportunity Comm'n v. Mfrs. & Traders Tr. Co.*,
  429 F. Supp. 3d 89 (D. Md. 2019) ............................................................33

*Frogge v. Fox*,
  No. 1:17CV155, 2019 WL 2418749 (N.D.W. Va. June 10, 2019).....................31

*Gomez-Perez v. Potter*,
  553 U.S. 474 (2008) .................................................................................27

*Harvey v. GoBo Inc.*,
  No. 6:16-cv-76, 2017 WL 4973205 (E.D. Va. Jan. 17, 2017) ...........................28

*In re N-500L Cases*,
  691 F.2d 15, 25 (1st Cir. 1982) ................................................................29

*Infantolino v. Joint Indus. Bd. of Elec. Indus.*,
  582 F. Supp. 2d 351 (E.D.N.Y. 2008).......................................................27

*Jacobs v. York Union Rescue Mission, Inc.*,
  No. 1:12-CV-0288, 2014 WL 6982618 (M.D. Pa. Dec. 10, 2014).....................36

*Johnson v. J.C. Penney Corp., Inc.*,
  No. CV-13-S-1088-NE, 2015 WL 12765882 (N.D. Ala. Mar. 31, 2015) ...........35

*Keller v. Prince George's Cnty.*,
  827 F.2d 952 (4th Cir. 1987)....................................................................29

*Kerr v. Marshall Univ. Bd. of Governors*,
  824 F.3d 62 (4th Cir. 2016).....................................................................31

*Khan v. Worcester Cnty.*,
  24 F. App'x 183 (4th Cir. 2001)...............................................................18

*Kolstad v. Am. Dental Ass'n*,
  527 U.S. 536 (1999) .................................................................................22

*Kramer v. Banc of Am. Sec., LLC*,
  355 F.3d 961 (7th Cir. 2004).............................................................. 24, 25

*Laird v. Fairfax Cnty., Va.*,
  978 F.3d 887 (4th Cir. 2020)....................................................................42

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004) .......................................................................... 23, 24

*Lewis v. City of Union City, Ga.*,
  934 F.3d 1169 (11th Cir. 2019).................................................................37

*London v. Loyola High Sch. of Balt., Inc.*,
  806 F. App'x 255 (4th Cir. 2020)..............................................................18

*Lucas v. United States*,
   No. 20-1977, 2021 WL 5397596 (4th Cir. Nov. 18, 2021)...................................31

*Marchetti v. Kinross Gold U.S.A., Inc.*,
   2:15-cv-02095, 2017 WL 2174952 (D. Nev. May 17, 2017) .............................35

*Mazzeo v. Color Resolutions Int'l, LLC*,
   746 F.3d 1264 (11th Cir. 2014)...................................................................37

*McAdams v. Robinson*,
   26 F.4th 149 (4th Cir. 2022).......................................................................17

*Mich. v. Bay Mills Indian Cmty.*,
   572 U.S. 782, 794 (2014) ...........................................................................24

*Mogenhan v. Napolitano*,
   613 F.3d 1162 (D.C. Cir. 2010) .................................................................43

*Muller v. Costello*,
   187 F.3d 298 (2d Cir. 1999).......................................................................25

*Nader v. Blair*,
   549 F.3d 953 (4th Cir. 2008).....................................................................17

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1974) ........................................................................... 26, 27

*Neely v. PSEG Texas, Ltd. P'ship*,
   735 F.3d 242 (5th Cir. 2013).....................................................................32

*Oak Point Partners, LLC v. Blue Cross Blue Shield of Mich.*,
   No. 2:19-CV-10662, 2020 WL 6939667 (E.D. Mich. Nov. 25, 2020)...............33

*Palish v. K&K RX Servs., L.P.*,
   No. 13–CV–4092, 2014 WL 2692489 (E.D. Pa. June 13, 2014)........................36

*Pandazides v. Va. Bd. of Educ.*,
   13 F.3d 823 (4th Cir. 1994)................................................................ 19, 29

*Reyes-Gaona v. N.C. Growers Ass'n*,
   250 F.3d 861 (4th Cir. 2001).....................................................................23

*Rhoads v. F.D.I.C.*,
   94 F. App'x 187 (4th Cir. 2004).................................................................28

*Salitros v. Chrysler Corp.*,
   306 F.3d 562 (8th Cir. 2002).....................................................................25

*Simpson v. Vanderbilt Univ.*,
   359 Fed. App'x 562 (6th Cir. 2009)............................................................37

*Skerce v. Torgeson Elec. Co.*,
   852 F. App'x 357 (10th Cir. 2021)..............................................................38

*Thomasson v. Perry*,
  80 F.3d 915 (4th Cir. 1996)....................................................................23
*U.S. Dep't of Labor and N.C. Growers Ass'n*,
  377 F.3d 345, 350 (4th Cir. 2004)........................................................23
*United States v. Thorson*,
  633 F.3d 312 (4th Cir. 2011)................................................................16
*Via v. Comm'n Corp. of Am. Inc.*,
  311 F. Supp. 3d 812 (W.D. Va. 2018)...................................................28
*Walsh v. Vinoskey*,
  19 F.4th 672 (4th Cir. 2021)...................................................... 16, 17, 40
*Walton v. Johnson*,
  440 F.3d 160 (4th Cir. 2006).................................................................17
*Westside Cmty. Bd. of Educ. v. Mergens*,
  496 U.S. 226 (1990) ..............................................................................23
*Williams v. Quality Tech., Inc.*,
  No. 119CV106LMBMSN, 2020 WL 807526 (E.D. Va. Feb. 18, 2020).............28

**Statutes**

42 U.S.C. § 12112 ............................................................................ 21, 27
42 U.S.C. § 12117 ...................................................................................20
42 U.S.C. § 12203 ............................................................................ 20, 21
42 U.S.C. § 1981a .......................................................................... passim
42 U.S.C. § 2000e-3 ...............................................................................22
42 U.S.C. § 2000e-5 ........................................................................ 20, 25

**Rules**

Fed. R. Civ. P. 52 ...................................................................................17
Fed. R. Civ. P. 56 ...................................................................................17
Fed. R. Evid. 106 ...................................................................................34

**Regulations**

29 CFR § 1630.2 ........................................................................... 30, 32, 38

## STATEMENT OF ISSUES

1. Whether the District Court correctly found that only equitable damages are available for an ADA retaliation claim, and thus, Israelitt had no statutory or constitutional right to a jury trial.

2. Whether the District Court correctly granted summary judgment in favor of Defendant as to Israelitt's discrimination claims, and correctly found that he was not disabled within the meaning of the statute.

3. Whether the District Court correctly applied the standard for retaliation and correctly found that Israelitt's removal from scrum calls, having specified deadlines and work requirements, not participating in a conference and/or work trip, and having his time charged to overhead were not adverse actions in the context of a retaliation claim under the facts shown.

4. Whether the District Court's reference to a document not separately admitted at trial constitutes harmless error when significant documentary and testimonial evidence supported the District Court's finding.

## STATEMENT OF THE CASE

## I.    INTRODUCTION

Plaintiff-Appellant Israelitt ("Israelitt") is a former employee of Hewlett Packard ("HP") (named as Defendant-Appellee Enterprise Services, LLC, a

1

predecessor entity ("ES")).[1]   Following Israelitt's consistent failure to meet expectations, he was discharged.   Israelitt subsequently claimed to have a toe condition and alleged that HP violated the Americans with Disabilities Act ("ADA"), claiming disability discrimination, denial of a reasonable accommodation, harassment, and retaliation.

Following discovery, ES moved for summary judgment.  The district court dismissed all of Israelitt's discrimination claims, including harassment and failure to accommodate.  First, the court held that Israelitt could not demonstrate that he was disabled within the meaning of the statute, and that even if he were, he could not meet the remaining elements of his discrimination claim, including the "but for" standard, or show a discriminatory animus on the part of his manager and decision-maker George Romas ("Romas").  Second, it held that other than his discharge, none of the complained-of acts were adverse under the discrimination or retaliation standards.  Only Israelitt's retaliatory discharge claim remained.

---

[1]    HP split into two: Hewlett Packard Enterprise ("HPE") and HP, Inc. HPE then spun off the Enterprise Services segment of its business in 2017, which merged with Computer Sciences Corporation to become DXC Technology Company.  DXC then spun off the public sector of its Enterprise Services business to merge with Vencore and KeyPoint to form Perspecta Inc. in 2018. Enterprise Services LLC, now a subsidiary of Perspecta, became "Perspecta Enterprise Solutions LLC" on November 1, 2018. *See* SA.1-4; JA.1137-1138.

Prior to trial, ES moved to set the matter for a bench trial. The district court correctly found that an ADA retaliation claim permits recovery of only equitable damages, and thus Israelitt had no right to a jury trial.

On February 14-15, 2022, this matter was tried before the district court in a bench trial. On March 7, 2022, the district court issued its Memorandum of Decision finding in favor of ES. This appeal followed.

## II.    STATEMENT OF FACTS

### A.    Israelitt was employed by HP for just over six months.

Romas, HP's Chief Engineer and Technical Director of the Cybersecurity practice for the U.S. Public Sector, led a cybersecurity lab responsible for research and development.[2, 3] The team was funded by an overhead investment by HP.[4] During the relevant period, HP's Cybersecurity Solutions Group ("CSG") was, among other things, preparing to bid on an upcoming request for proposal to be issued by the Department of Homeland Security ("DHS").[5] Jess May, Offering Manager/Cybersecurity Practice Lead, managed the CSG offering development

---

[2]     SA.280; SA.209-210.

[3]     SA.40; SA.62; SA.210.   HP had a long-standing commitment to equal employment opportunity in its business operations and employment practices. HP's Global Harassment-Free Work Environment and Global Non-Discrimination Policies specifically prohibited harassment and discrimination based on disability. *See* SA.130-182.

[4]     JA.364; JA.369.

[5]     JA.1045; SA.209-210.

process, including the budget for the DHS project.[6]  Although Romas' team was

generally funded as overhead, some of his team's work supported the DHS bid and

proposal ("B&P") project and was charged to its budget via internal accounting.[7]

Israelitt was employed by HP at-will from August 5, 2013, until his discharge

on February 14, 2014.[8]  Romas interviewed and hired Israelitt as Senior Information

Systems Security Architect V and supervised Israelitt.[9]  Israelitt earned $180,000

annually and was one of the highest paid employees on Romas's team.[10]  Although

local to the D.C. Metro area, Israelitt worked remotely from his home.[11]

Israelitt's role was to help guide technical strategy for security architectures,

products, and solutions.[12]  Romas tasked Israelitt with providing recommendations

and analysis on a project called the "Requirements Traceability Matrix" or "RTM",

a component of the DHS requirements for cybersecurity solutions.[13]  In addition,

Romas assigned Israelitt to review different products needed in the lab to align with

---

[6]     SA.212.  May had no supervisory authority over Israelitt.  SA.49.

[7]     JA.1045; JA.369 (explaining internal accounting codes depended on what the employee was working on, and included overhead; bid and proposal funds; billable client work; training funds).

[8]     JA.951-952; *see also* SA.210; JA.499-502; JA.629-630.

[9]     SA.44; SA.46; JA.951; SA.280; SA.282-283; SA.209-210; JA.749-754.

[10]    SA.53; SA.210.

[11]    JA.191.

[12]    SA.210; *see also* SA.61; JA.1039.

[13]    SA.210.

4

the products being used by HP's customers.[14]  Israelitt was to research the various

existing products and determine specific issues related to customer needs.[15]  Romas

referred to this project as the "Technology Roadmap."[16]

### B. Israelitt claims an alleged toe condition.

Israelitt asserts a single impairment relevant to this lawsuit: a condition of his

"great right toe."[17]  Israelitt offered no evidence of medical care for his condition for

well over a decade (a period which included his employment); requires no assistive

device to help him walk; and is able to drive and fully care for himself at home.[18]

No doctor has ever placed him on any restrictions.[19]  When Israelitt traveled to Texas

for a work meeting, he required no disability-related accommodations, and when he

travels for personal reasons he does not need a handicapped room.[20]  Israelitt walks

for exercise approximately twice per week for 30-45 minutes at a time.[21]  Israelitt's

---

[14]     SA.211.

[15]     SA.211.

[16]     SA.211.

[17]     JA.15; JA.1013.

[18]     JA.937; JA.1016-1017.

[19]     JA.1016-1017.  Additionally, Plaintiff never had a military disability rating.
JA.941.

[20]     JA.951; SA.116-117.

[21]     JA.937-938.  On the work trip to Texas, a coworker noted that they "walked
all the way around all over the place," and that Israelitt never complained about his
toe.  SA.329.

toe did not impede his ability to do his job in any way.[22]

### C.    Israelitt raised issues regarding attending HP Protect.

HP Protect was a customer-focused conference aimed at demonstrating HP's products.[23]  It was held at the Washington, D.C. Hilton from September 16-19, 2013.[24]  As a sales-focused event, most HP employees, including the CSG, did not attend absent a specific reason, and no funding was budgeted for such attendance.[25] Attendance at this event had no effect on team members' raises, bonuses, or promotions.[26]

Kevin Doty, a CSG business consultant, reached out to Todd Helfrich, DHS Enterprise Account Executive, asking if he and Israelitt could attend the conference without payment of the registration fee as a favor.[27]  Helfrich provided a code for

---

[22]    SA.118.

[23]    SA.220-221.

[24]    SA.220.

[25]    SA.220-221.  Because of the limited budget, only a handful of senior level employees attended, and most of the CSG did not.  SA.319; JA.1177-1178; JA.985; SA.223.  As a new employee, Plaintiff did not have the knowledge to communicate about HP's products, and attending was not necessary in any way.  SA.66; SA.285; SA.221.  Rather, Plaintiff merely thought that attending would be useful to see HP products and network.  SA.124-125.  In contrast, Romas attended because was providing technical support at a booth, and Doty was responsible for setting up a meeting at the conference.  SA.284-285; SA.317.

[26]    SA.80-81; SA.221.

[27]    JA.537; SA.318.  Doty invited Plaintiff for company.  SA.319.

the on-line registration process to a limited number of people, including Israelitt.[28] As this particular code was restricted for customer use, Helfrich advised them to use a non-HP email address so their registration would not be flagged by the registration process.[29]  Both did so.[30]

Hotel reservations, available via the online conference registration, were not necessary for those local to the D.C. area.[31]  (Romas, for example, commuted into D.C. each day.)[32]  Israelitt's attendance was not required and not funded; even so, he wanted to attend and planned to pay for a hotel even though he was local to the metro area.[33]  Despite being advised that the hotel regularly sold out, Israelitt did not immediately register.[34]  By the time he did, there were no rooms available.[35] Nevertheless, Israelitt pursued a hotel room with the event staff, a fact of which he advised Romas.[36]  Israelitt alleged he did so because he wanted to avoid the commute

---

[28]    SA.221.

[29]    SA.183.

[30]    SA.192.

[31]    SA.19; SA.322-323.

[32]    JA.374.

[33]    JA.977.

[34]    JA.968-969; SA.327.

[35]    JA.971; SA.322-323.

[36]    JA.785-787.

7

from his home in Maryland.[37]  Significantly, he did not seek and admittedly did not

need, a room for handicapped guests.[38]  He simply wanted to avoid driving.[39]

On September 6, 2013, Israelitt contacted event staff seeking assistance with

securing a hotel room.[40]  Event staff identified Israelitt's registration code as one

reserved for customers and on September 10, instructed him to register as an HP

employee and provide payment.[41]  Because of the lack of funding and because

attendance was not required, Israelitt was not provided with an alternate registration

code.[42]  While Israelitt was ultimately able to secure a hotel room, he did not attend

the conference because he did not have a valid registration code (and apparently

---

[37]    Although in the litigation Israelitt explained he wanted to avoid stop-start traffic because it hurt his toe, he did not alert Romas of that issue.  JA.981; SA.292-293; SA.295-296; SA.222.    Indeed, an email from Israelitt to Romas pointedly showed that Plaintiff *did not* want Romas to know anything about his toe, referring to "medical/disability info that I asked you not to share with anyone."  JA.764. Romas never had a clear understanding of any disability issue, and Plaintiff never advised him that he had a disability.  SA.293-296.  JA.375.

[38]    JA.203.

[39]    JA.201.

[40]    JA.969, JA.972, JA.546.    Plaintiff's email was entitled "Request for Assistance with HP Protect 2013 Registration."  JA.546.

[41]    JA.973-974; SA.189.    There is no evidence that the event staff noticed the customer code usage by any other HP employee.  SA.322-323.

[42]    SA.220-221.  Ultimately, Plaintiff was able to secure a hotel room.  JA.973, JA.982, JA.988, JA.555.  Indeed, Plaintiff found that the HP Protect event staff very helpful securing a room.  JA.972-973, JA.988, SA.124-125.  Notably, Plaintiff does not blame Romas, May, Doty, Helfrich, or other coworkers for his inability to attend HP Protect.  JA.974, SA.78, SA.81.

chose not to personally pay for registration).[43]

### D. __Israelitt had ongoing performance deficiencies.__

Throughout his employment, Israelitt had ongoing performance issues. The CSG team utilized "agile methodology," an approach commonly used for software development.[44] From the outset, Israelitt failed to comply with this methodology and consistently failed to provide deliverables within assigned two-week sprints.[45] Israelitt often failed to attend daily standing meetings[46] and when he did, often had no updates of substance.[47] Rather, he frequently hijacked team meetings, taking them off topic with long-winded monologues concerning irrelevant issues and frustrating the method's efficiency.[48] Meetings scheduled for 15-30 minutes often lasted an hour.[49]

---

[43]    JA.974; SA.73; SA.78; SA.290-292; SA.222-223.

[44]    SA.211-213. Under this methodology, the process was broken down into a series of incremental tasks to be completed within a short time frame (1-2 days). The series to be completed during two-week periods are called "sprints," with a completed milestone at the end of each sprint. The team then identifies the milestone and tasks for the next sprint. Each day, there is a brief conference call, or "scrum," with the team, who was kept on-task by a "scrum master." SA.211-213.

[45]    SA.213.

[46]    SA.213; SA.330.

[47]    SA.213.

[48]    SA.213.

[49]    JA.325-326, JA.381-382.

Further, Israelitt's conduct was perceived as argumentative and distracting.[50] Several CSG team members, including Scrum Master Heath Kinney and May, complained to Romas about Israelitt's behavior.[51]  In addition, Israelitt's failure to deliver assigned tasks in any timely or substantive manner slowed the schedule and resulted in missed milestones.[52]  The scant work product that Israelitt did produce was of poor quality, a concern May raised to Romas given the high cost of Plaintiff's time being charged to the DHS B&P budget that she oversaw.[53]

Romas, who had managed the team for over two years, had observed no personnel or compatibility issues prior to Israelitt joining the team.[54]  Nevertheless, Israelitt frequently groused about petty issues and perceived slights to himself and others, and sent long, rambling email complaints to Romas.[55]  In nearly all of Israelitt's complaints, he alleged that he and someone else were being slighted.[56] Israelitt complained that he was being left off of communications, and that team-member Jeff Kalibjian and Romas were as well.[57]  Israelitt also perceived a "power

---

[50]    SA.213.

[51]    SA.213.

[52]    SA.213.

[53]    SA.214; JA.1061-1062.

[54]    JA.384-385.

[55]    JA.382-385, SA.217.

[56]    *See* JA.755-756, JA.789-792.

[57]    SA.83; SA.86.

struggle" between Romas' and May's teams.[58]   Romas looked into Israelitt's complaints, but it appeared that Israelitt's uncooperative and confrontational behavior was the root, and that Israelitt regularly took offense at simple suggestions or normal disagreements with his proposed approach.[59]

Because Israelitt failed to adapt to or contribute within the agile methodology, around September 30, 2013, Romas reassigned Israelitt to the RTM and Technology Roadmap.[60]   As these tasks were longer-term projects not dependent on the agile process, there was no need for Israelitt to attend daily scrum calls.[61]   Israelitt told Romas that was "[n]o problem with that from [his] viewpoint."[62]   Romas also paired Israelitt with Kalibjian, his most Senior Architect, for additional support and guidance.[63]

In October 2013, Romas conducted a performance review of Israelitt, and discussed with him his need for improvement in achieving goals and communication.[64]   However, despite counseling and support from Romas, guidance

---

[58]    SA.47-48; SA.122-123.

[59]    SA.217-218; SA.84-86.

[60]    SA.214.

[61]    SA.214; JA.797.

[62]    JA.797.  *See also* JA.1061-1062.

[63]    SA.214; SA.50.

[64]    SA.215; JA.745; JA.961.

11

from Kalibjian, and reassigning Israelitt to tasks that allowed him to work independently from the agile group, Israelitt's performance did not improve. He still failed to meet deadlines or produce substantive work.[65]

In addition, May again raised concerns to Romas about Israelitt's failure to produce value for the DHS project despite his significant labor cost.[66] In December 2013, May emailed Israelitt and requested that he no longer charge time to the DHS B&P budget; Romas agreed that Plaintiff would charge his time to general "engineering" overhead cost code instead.[67] Notably, Romas testified that at one time or another his entire team charged as overhead except when assigned to other tasks, and that they were not billable to a client unless a contract was actually won.[68]

### E.   Israelitt did not attend a January 2014 work trip to Florida.

In December 2013, May began planning a meeting in Florida, for the CSG / DHS B&P team, scheduled for January 5-10, 2014.[69] May had a small budget which required attendees to share accommodations and vehicles.[70] Although Romas was

---

[65]   SA.216.

[66]   SA.217.

[67]   SA.217. *See* JA.595.

[68]   JA.395. The DHS project was in bid development; it was not an acquired contract and not billed to any client.

[69]   SA.223; JA.170; JA.1063; JA.1082 SA.331-332.

[70]   SA.223. May rented vans to shuttle the attendees during the trip. JA.1064-1065.

not involved in planning, Israelitt told Romas that he wanted to be listed as a driver on one of the rental cars, but did not indicate it was related to an alleged disability.[71] Plaintiff did not engage HR or speak with May about this request or obtaining an accommodation.[72]  Despite having testified that he needed a hotel for the HP Protect Conference to *avoid* driving because of his toe condition, he later testified that he *needed* to be a driver on the Florida trip because of his toe condition.[73]  As he was reassigned from the DHS B&P budget, however, he ultimately did not attend.  His absence had no effect on compensation or promotions, and no detrimental impact to his employment.[74]

---

[71]     JA.992-995; JA.1064; SA.223.  Plaintiff wanted to be listed as a separate driver so that he would not have to "tak[e] another person out of activities" to drive him around.  JA.992-993.  There is no indication that Plaintiff could not have ridden as a passenger or taken a taxi or Uber.  JA.996.

[72]     JA.993; JA.999; SA.124.   At no time did Plaintiff ever provide any documentation related to his toe or any limitations to anyone at HP.  SA.118-119. Plaintiff additionally could not confirm that he ever advised May of an issue with his toe, but merely speculated that she must have known.  JA.996-999.  The matter ultimately became moot.  After Plaintiff was reassigned from the DHS B&P project, there was no need for him to attend.  JA.1001; SA.224.

[73]     JA.109-110, JA.132-133, JA.171.

[74]     JA.1006-1007.  Kalibjian also did not attend this trip or HP Protect, with no detriment, and remains employed by an HP successor company.  JA.1004-1005; JA.255.

### F.   Israelitt received a performance warning and was subsequently terminated.

By January 2014, Israelitt's performance had not improved, and Romas engaged HR for consultation and assistance.[75]  On January 13, 2014, Romas issued a written performance warning with a performance improvement plan ("PIP") to Israelitt.[76]  It specified that Israelitt should focus on the satisfactory completion of the Technology Roadmap within 30 days.[77]  As Israelitt had originally been assigned this task in September 2013 and received examples and substantive feedback on several incomplete drafts, Romas believed completion was attainable within 30 days.[78]

At the end of the period, however, Israelitt had not only failed to complete the Technology Roadmap, he made no discernable progress.[79]  Thus, on February 14, 2014, Romas discharged Israelitt based on his continued performance deficiencies.[80] Neither Israelitt's inability to attend the conference, nor the Florida trip had any impact on his performance or on Romas' decision, nor did his request for a hotel or

---

[75]    SA.218.

[76]    JA.401, JA.623-624.

[77]    JA.623.

[78]    JA.404-405; SA.217-219.

[79]    JA.176; JA.407; JA.743-744; SA.109; SA.219.

[80]    JA.825-826; SA.219; SA.110-111.

14

to drive a rental car.[81]  Israelitt provided no evidence of a discriminatory animus by Romas, nor did he produce evidence of any causal connection between his discharge and his requests for accommodation.[82]

## SUMMARY OF THE ARGUMENT

The district court correctly held that Israelitt was not disabled within the meaning of the ADAAA, and that the only adverse action alleged under the discrimination and retaliation standards was his discharge.  Further, the evidence showed that the accommodations he requested were neither reasonable nor made in good faith. Thus, his claims of discrimination, failure to accommodate, and harassment properly failed.

Moreover, even if he were disabled, he could not meet the remaining mandatory elements of these claims, including proving pretext.   Rather, his discharge was based on a legitimate, non-discriminatory, non-retaliatory reason. There was no evidence of a discriminatory animus, and no causal connection between his purported accommodation requests and discharge.  In short, Israelitt failed to carry his burden to show that he would not have been discharged "but for" his purported disability or any related accommodation request.

---

[81]     JA.408-409; SA.224.

[82]     JA.77-80.

Further, Israelitt's claim of ADA retaliation was properly heard as a bench trial, as the ADA provides only for equitable damages; as such, he had no statutory or constitutional right to a jury trial.

Finally, the district court's consideration of one piece of documentary evidence not admitted at trial is harmless error, as the court's factual findings were amply supported by other documentary and testimonial evidence.

## ARGUMENT

### I.     STANDARD OF REVIEW

#### A.     Clear Error

Following a bench trial, as here, the Fourth Circuit reviews the district court's factual findings for clear error. *Walsh v. Vinoskey*, 19 F.4th 672, 676 (4th Cir. 2021). "[C]lear error" is a "very deferential standard of review," under which the appellate court may reverse only when it is "left with a definite and firm conviction that a mistake has been committed." *United States v. Horton*, 693 F.3d 463, 474 (4th Cir. 2012). The Court's inquiry "is not whether we would have reached the same result if we were sitting in the district court's shoes. Rather, we review 'if the district court's account of the evidence is plausible in light of the record viewed in its entirety.'" *Id.* (citing *United States v. Thorson*, 633 F.3d 312, 317 (4th Cir. 2011)) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)). "If so, we may not reverse the district court's conclusion—even if we may have weighed the evidence differently. This is the case 'even when the district court's findings do

not rest on credibility determinations but are based instead on physical or documentary evidence or inferences from other facts.'" *Walsh*, 19 F.4th at 677 (*quoting Anderson*, 470 U.S. at 574).

The scope of review is narrow; courts "do not exercise *de novo* review of factual findings or substitute our version of the facts for that found by the district court." *Id.* (quoting *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006)). Rather, "if the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (quoting *Walton*, 440 F.3d at 173). *See also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility").

### B.   *De Novo* **Review**

The Fourth Circuit reviews questions of law *de novo*, including questions of statutory interpretation. *McAdams v. Robinson*, 26 F.4th 149, 155 (4th Cir. 2022). A district court's grant of a motion for summary judgment is also reviewed *de novo*, applying the same standards as the district court. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). Fed. R. Civ. P. 56(a) provides that summary judgment *shall* be granted when there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law. Summary judgment is not merely a procedural shortcut; it is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . and Rule 56 should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323-24. Summary judgment is thus *mandated* against a party who fails to establish an essential element of that party's case and on which that party bears the burden of proof. *Id.* at 322.

Where, as here, the plaintiff bears the burden at trial, the defendant need not produce evidence negating or disproving every essential element of the plaintiff's case. *Id.* at 323. Rather, the defendant simply must identify the absence of evidence supporting the plaintiff's case. The burden then shifts to the plaintiff to make an affirmative showing on all matters placed at issue by the motion. *Id.* at 324-25. This burden is not a light one. The plaintiff must show more than "the mere existence of a 'scintilla of evidence'" or "some 'metaphysical doubt'" as to the material facts." *London v. Loyola High Sch. of Balt., Inc.*, 806 F. App'x 255, 256 (4th Cir. 2020). Further, mere speculation and conjecture cannot create disputes of material fact to avoid summary judgment. *Khan v. Worcester Cnty.*, 24 F. App'x 183, 188 (4th Cir. 2001).

II.    **DISCUSSION**

A.    **The district court properly found that Israelitt had no right to a jury trial on his ADA retaliation claim.**

The district court, in alignment with two prior (unpublished) Fourth Circuit decisions and the reasoning of every Circuit Court to consider the issue, correctly held that based on the plain language of 42 U.S.C. § 1981a, compensatory and punitive damages are not available for an ADA retaliation claim, and thus, there is no right to a jury for that claim.  Israelitt, and the EEOC in its amicus brief, now urge the Court to disregard the lead of such cases and instead find that compensatory and punitive damages *should* be available for ADA retaliation claims.  This Court should reject those arguments and affirm the district court's decision.

The Seventh Amendment to the U.S. Constitution provides a right to a jury trial upon demand only if a statute creates legal rights and remedies that are "enforceable in an action for damages in the ordinary courts of law."  *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994) (quoting *Curtis v. Loether*, 415 U.S. 189, 194 (1974)).  Where only equitable relief is available, there is no right to a jury trial.  *Id.*  Thus, whether Israelitt was entitled to a jury trial depends on whether compensatory and punitive damages are available for an ADA retaliation claim.  An examination of the relevant statutes shows that such damages are not available.

19

The ADA prohibits retaliation for engaging in conduct protected under the ADA.  42 U.S.C. § 12203(a).[83]  The retaliation statute points to 42 U.S.C. § 12117 for the available remedies for violations.  § 12203(c).[84]  Section 12117 in turn adopts the remedies available within Title VII.[85]  Title VII sets forth the equitable relief that is available for violations:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such lawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , **or any other equitable relief as the court deems appropriate**. . . .

42 U.S.C. § 2000e-5(g)(1) (emphasis added).  Thus, only equitable relief is available for an ADA retaliation claim.

---

[83]    The ADA retaliation statute reads in full: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  Sec. 12203(a).

[84]    "The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively."  Sec. 12203(c).

[85]    "The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment."  Sec. 12117(a).

20

In 1991, Congress enacted § 1981a, which expanded remedies and provided for compensatory and punitive damages for *certain* specified violations of federal employment law. Israelitt's claim to a jury trial therefore turns on whether Congress provided for the availability of compensatory and punitive damages for ADA retaliation claims in § 1981a. A close reading reveals that Congress did not.

The subsection of § 1981a regarding disability reads in relevant part:

> In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 [§ 2000e-5] . . . of the Civil Rights Act of 1964 (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)) . . . ) against a respondent who engaged in unlawful intentional discrimination … under . . . section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act [§ 12112(b)(5)], against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 [§ 2000e-5(g)], from the respondent.

Sec. 1981a(a)(2). The statute allows for compensatory and punitive damages for only two specifically enumerated claims—intentional discrimination under § 12112 and failure to make reasonable accommodations for an individual with a disability under § 12112(b)(5). Noticeably absent is any reference to the separate statute regarding ADA retaliation, § 12203.

The Supreme Court has addressed the changes brought about by the 1991 amendments, stating that "[p]rior to 1991, only equitable relief . . . was available to Title VII plaintiffs; the statute provided no authority for an award of punitive or

21

compensatory damages." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 536, 533-34 (1999). As the Court further observed, in passing the 1991 Act, "Congress provided for additional remedies . . . for ***certain classes*** of Title VII and ADA violations." *Id.* (emphasis added). "Certain classes" clearly does not mean "all" possible claims under Title VII and the ADA. Though Israelitt and the EEOC assert there is a lack of clarity, the plain language of the statute and the exclusion of ADA retaliation from § 1981a(a)(2) lead to only one outcome—ADA retaliation claims are not entitled to compensatory and punitive relief.

Had Congress wanted to include retaliation in this statute, it easily could have done so; indeed, Congress specifically listed Title VII's retaliation statute in the subsection directly above the subsection regarding disability. *See* § 1981a(a)(1). This subsection allows for compensatory and punitive damages for unlawful intentional discrimination "prohibited under section . . . 704" of the Civil Rights Act of 1964. Section 704 prohibits retaliation against any individual who engaged in conduct protected by Title VII. Sec. 2000e-3(a). In contrast, § 1981a makes no reference to the equivalent ADA retaliation statute. Thus, Congress's intent is clear: compensatory and punitive damages are available for retaliation claims under Title VII but not for such claims under the ADA. *See Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269 (9th Cir. 2009) ("Congress may have well advisedly limited

punitive and compensatory damage awards to those plaintiffs who are able to prove discrimination due to an actual disability.").

"When interpreting statutes we start with the plain language." *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) (quoting *U.S. Dep't of Labor and N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004)). ". . . when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Id.* (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). As the Supreme Court and the Fourth Circuit have repeatedly held, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 136 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

"[T]he doctrine of *expression unis est exclusio alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001). Additionally, Courts of Appeal cannot "lightly second-guess" the "duly enacted and carefully considered" legislative judgments of a co-equal and representative branch of Government. *Thomasson v. Perry*, 80 F.3d 915, 923 (4th Cir. 1996) (quoting *Westside Cmty. Bd. of Educ. v. Mergens*, 496 U.S. 226, 251 (1990)). The Supreme Court held that courts

have "no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that . . . Congress 'must have intended' something broader." *Mich. v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014).

Despite this clear absence, Israelitt and the EEOC nevertheless would have the Court create a new remedy by reading ADA retaliation into § 1981a and to hold that such claims are entitled to compensatory and punitive damages. This is not the Court's role. Even if Congress's failure to include ADA retaliation claims were an oversight, the Supreme Court has explained, "[i]f Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result." *Lamie*, 540 U.S. at 542 (internal quotations omitted). Under the plain language of the statute, ADA retaliation is ***not*** included in § 1981a, and it would be inappropriate for the Court to insert it now.

## 1. The weight of authority reflects that no jury is available on an ADA retaliation claim.

Two circuit courts—the Seventh and Ninth Circuits—have directly considered this issue in depth in published opinions, and both reached the conclusion that, under the plain language of § 1981a, compensatory and punitive damages are not available for ADA retaliation claims. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 963 (7th Cir. 2004); and *Alvarado*, 588 F.3d at 1263.

24

In *Kramer*, the Seventh Circuit explicitly held that because the plaintiff was "not entitled to recover compensatory and punitive damages, she has no statutory or constitutional right to a jury trial. The only remedies Kramer (or any plaintiff bringing a claim of retaliation against an employer under the ADA) was entitled to seek were equitable in nature." 355 F.3d at 966, *citing* 42 U.S.C. § 2000e-5(g)(1) (stating that where an employer has engaged in an unlawful employment practice, a court may issue an injunction, reinstatement, order back pay, or award "any other equitable relief as the court deems appropriate"). Thus, there is no ***right*** to a jury where the only remedies available are equitable. *Id.*

The Seventh Circuit acknowledged that while some Circuits had affirmed jury verdicts where compensatory and punitive damages were awarded on ADA retaliation claims, the issue is whether the plaintiff has a statutory or constitutional *right*; indeed, the court noted that none of those cases examined the legal question of whether such damages were authorized for an ADA retaliation claim. *Id.* at 965 (citing *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002); *Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999); *E.E.O.C. v. Wal-Mart Stores, Inc.*, 187 F.3d 1241 (10th Cir. 1999)). The Seventh Circuit determined that because ADA retaliation claims were not listed in § 1981a, based on the plain language, "compensatory and punitive damages are not available for such claims." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458

(1974) ("when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.").  In sum, while there are cases in which ADA retaliation claims were tried by a jury, those cases are distinguishable because: (1) they involved other, additional claims for which the plaintiff *was* entitled to a jury; (2) the parties explicitly agreed to a jury or implicitly agreed by not raising the issue; and/or (3) the issue was not before the court (*i.e.*, the court was considering whether there was sufficient evidence to award such damages, not the legal question of whether such damages were *authorized* for an ADA retaliation claim).

Similarly, in *Alvarado*, the Ninth Circuit agreed with the Seventh Circuit and determined that that court's reasoning "adheres more closely to the precepts of statutory construction," and finding the text was "not ambiguous."  588 F.3d at 1267-68.  Rather, "[i]t explicitly delineates the specific statutes under the ADA for which punitive and compensatory damages are available."  *Id.* at 1268.  The court concluded that "the plain and unambiguous provisions of 42 U.S.C. § 1981a limit the availability of compensatory and punitive damages to those specific ADA claims listed.  ADA retaliation is not on the list."  *Id.* at 1269-70.

The Ninth Circuit also distinguished many of the same cases and arguments made by Israelitt and the EEOC, including *Edwards v. Brookhaven Science Associates, LLC*, 390 F. Supp. 2d 225 (E.D.N.Y. 2005), a case which ignored the

plain language and made the leap that Congress must have intended ADA retaliation to be included in § 1981a. The Ninth Circuit adopted criticism of the *Edwards* decision, citing a case that rejected *Edwards* "because the relevant provision of the Civil Rights Act of 1991 authorizes additional remedies for violations of Title I (specifically, punitive and compensatory damages), and does not even mention Title V [the retaliation provision]." *Alvarado*, 588 F.3d at 1267 (quoting *Infantolino v. Joint Indus. Bd. of Elec. Indus.*, 582 F. Supp. 2d 351, 362-63 (E.D.N.Y. 2008)). The Ninth Circuit also found that reading ADA retaliation into § 1981a "voids the references to §§ 12112 and 12112(b)(5) in § 1981a(a)(2) of any meaning in any conceivable context." *Id.* (quoting *Arredondo v. S2 Yachts*, 496 F. Supp. 2d 831, 835 (W.D. Mich. 2007)).

The Ninth Circuit similarly rejected Israelitt's argument that *Gomez-Perez v. Potter*, 553 U.S. 474 (2008) (an Age Discrimination in Employment Act ("ADEA") case) changes the analysis. *Alvarado*, 588 F.3d at 1269. The Ninth Circuit observed that *Gomez-Perez* held that the ADEA's anti-discrimination provision encompassed a cause of action for retaliation, but "the Supreme Court did not address the applicable statutory remedies, and in no way undermined the proposition that 'when legislation expressly provided a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies.'" *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 414 U.S. at 458).

27

Finally, and significantly, the Fourth Circuit has twice spoken directly on this issue in unpublished opinions, and both agreed with the Seventh Circuit's reasoning. In *Rhoads v. F.D.I.C.*, 94 F. App'x 187, 188 (4th Cir. 2004), the court held that the plaintiff was not entitled to recover compensative and punitive damages on her ADA retaliation claim "because such relief is unavailable." Similarly, the court in *Bowles v. Carolina Cargo, Inc.*, 100 F. App'x 889, 890 (4th Cir. 2004) addressed whether the plaintiff was entitled to a jury trial on his ADA retaliation claim. Because such a claim is limited to equitable relief, the Fourth Circuit said no. *Id.* Likewise, a multitude of district court cases in this circuit have come to the same conclusion.[86]

Accordingly, the Court should affirm the district court's finding that compensatory and punitive damages are unavailable for ADA retaliation claims and that Israelitt was not entitled to a jury trial.

### 2.    **Even if Israelitt were denied a jury trial, it was harmless error.**

Even if Israelitt had a right to a jury trial on his ADA retaliation claim (he did not), the Fourth Circuit has held that the denial of a jury trial constitutes harmless

---

[86]    *See, e.g.*, *Williams v. Quality Tech., Inc*., No. 119CV106LMBMSN, 2020 WL 807526, at *3 (E.D. Va. Feb. 18, 2020) (because an ADA retaliation claimant is "not entitled to recover compensatory and punitive damages, she has no statutory or constitutional right to a jury trial."); *Via v. Comm'n Corp. of Am. Inc.*, 311 F. Supp. 3d 812, 821-22 (W.D. Va. 2018); *Harvey v. GoBo Inc.*, No. 6:16-cv-76, 2017 WL 4973205, at *4 (E.D. Va. Jan. 17, 2017); *Dalton v. Lewis-Gale Med. Ctr. LLC*, No. 7:19-cv-204, 2019 WL 4394757, at *2 (W.D. Va. Sept. 13, 2019) (observing no substantial difference of opinion on the issue within the Fourth Circuit).

error where the trial judge would have directed a verdict (or judgment as a matter of law) in favor of the defendant. *Pandazides*, 13 F.3d at 827 (citing *Keller v. Prince George's Cnty.*, 827 F.2d 952, 955 (4th Cir. 1987)). "[T]he standard of review for such a motion is whether the evidence is such, without weighing the credibility of the witnesses, that there is only one conclusion that reasonable jurors could have reached." *Id.*[87]

Here, the trial court was explicit in its factual findings. The court points to both witness testimony *and* documentary evidence in its Memorandum of Decision, and it is clear the court would have reached the same conclusion even without weighing the credibility of the witnesses. Indeed, the court explained that the "evidence elicited at trial—both documentary and testimonial—***unequivocally demonstrates*** that Mr. Israelitt was terminated because he was an incompatible teammate who failed to take directions from his supervisors, and most significantly, failed to make any meaningful progress on the tasks that were assigned to him." JA.77 (emphasis added). Each of the court's findings cite not only to testimony but to documentary evidence in support. In other words, even disregarding any

---

[87]    *See also In re N-500L Cases*, 691 F.2d 15, 25 (1st Cir. 1982) (even if plaintiff was erroneously denied a jury trial, "a new trial is not required if the error was manifestly harmless," which requires a determination that even if appellants had a jury trial, the trial judge would have had to direct a verdict in favor of [defendants], finding denial of jury trial harmless because the evidence demonstrated that a jury verdict in favor of plaintiffs would not have been permitted to stand).

credibility determinations, the documentary evidence unequivocally demonstrated that Israelitt's discharge was completely unrelated to his supposed protected conduct and that he never proved the requisite causal connection.

Significantly, Israelitt bore the burden of proof, and the court expressly stated that: "Mr. Israelitt has not presented any evidence that any of these decisions were in any way related to his benign requests for accommodations that HP never opposed." JA.79. Moreover, the court noted that there was a "mountain of evidence that Mr. Israelitt was fired simply because he was an incompatible and unproductive employee." JA.79. In sum, not only did Israelitt *not* carry his burden of proof, but *significant* documentary evidence proved directly to the contrary, leaving only one possible outcome; that ES did not retaliate against him. Because the evidence is clear that the trial judge in a jury trial would have directed a verdict, any alleged denial of the right to a jury is harmless error.

## B.     The district court correctly found that Israelitt was not disabled.

Israelitt and the EEOC argue that the district court erred because it cited the superseded definition of "substantially limits" from the pre-amended version of 29 CFR § 1630.2(j)(1)(ii), and that accordingly, the court necessarily incorrectly decided that Israelitt was not disabled. Although the court did quote the former definition, both the court's analysis and the undisputed evidence make clear that

Israelitt's toe condition failed to clear the hurdle necessary to be considered a disability under the ADA Amendments Act ("ADAAA").

Indeed, the district court directly points to a post-ADAAA case, *Frogge v. Fox*, No. 1:17CV155, 2019 WL 2418749, at *6 (N.D.W. Va. June 10, 2019) noting that "some limitation in walking [in certain circumstances] . . . do[es] not equate to a substantial limitation in [the] ability to walk." *Frogge* noted that the parties agreed that the plaintiff suffered an impairment; rather, the issue was that she did not demonstrate that she was substantially limited in walking. *Id.* at *5. Though she testified that she had some limitation in certain conditions (walking in snow and uphill), she did not she was *substantially* limited, and she conceded no doctor ever placed her on any restrictions related to her ability to walk. *Id.* As such, she failed to show a substantial limitation within the meaning of the ADAAA. *Id.* at *6.

Here, the court's inclusion of language from the former regulation does not constitute reversable error. As this Court has regularly held, it "may affirm on any ground supported by the record." *Lucas v. United States*, No. 20-1977, 2021 WL 5397596, at *1 (4th Cir. Nov. 18, 2021). *See also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 75 (4th Cir. 2016) ("In our review, we may affirm on any grounds supported by the record, notwithstanding the reasoning of the district court."). The record soundly supports the finding that Israelitt was not disabled within the meaning of the ADAAA.

Both Israelitt and the EEOC argue that an impairment need not significantly restrict a major life activity to qualify as a disability under the ADAAA. As the amended statute makes clear, however, an individual must still demonstrate that the condition "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and that "not every impairment will constitute a disability within the meaning of this section." 29 C.F.R. § 1630.2(j)(1)(ii). As the Fifth Circuit observed, "though the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). Israelitt failed to prove a disability under any standard.

Israelitt's entire claim rests on his great right toe.[88] Despite the broad and dramatic characterization in his appellate brief relying on non-contextual sound bites of testimony that he "can barely walk," that he has "partial loss" of his foot usage, and it is "extremely painful," these statements were not borne out by the evidence. Rather, the evidence showed that he: received no medical treatment over a period of at least thirteen years; drives himself; needs no assistive device to walk; has never been placed on any medical restrictions; needs no handicapped hotel accommodations when he travels; did not need accommodations for a work trip to

---

[88]    JA.1013. Although Israelitt comments that "among other issues he suffers from a condition in his foot," Appellant Brief, p. 42, the *only condition at issue* is stiffness in his great right toe. JA.1013.

32

Texas; regularly walks twice-weekly, up to 45 minutes for exercise; and his toe condition did not impede his ability to do his job in any way.[89]

Israelitt offers no evidence other than his own unsubstantiated and vague testimony. He provides nothing to support a substantial limitation—which he still must show under the ADAAA—and absolutely nothing even temporally close to the six-month period of his employment (August 2013-February 2014).[90] Instead, he offered a vague medical note mentioning mild degenerative changes in one joint of his great right toe and bone spur removals 16 and 20 years prior to his employment. JA.519. Specifically, Israelitt offered a podiatrist note from 2006 (seven years prior

---

[89]    Plaintiff's reliance on the Corporate Representative's statement that she did not think HP "was in a position to make a declaration about [Plaintiff's] medical status and actual disability status," is absurd and taken out of context. Appellant Brief, p. 4. Counsel repeatedly asked Ms. Hellman for the company's stance on whether it intended to oppose Plaintiff's allegation that he was disabled, a (premature) legal conclusion that went to the crux of this claim. JA.1152-1156. Such legal conclusions are not appropriate questions for a 30(b)(6) witness; accordingly, Defense counsel objected. JA.1152-1156. *See Oak Point Partners, LLC v. Blue Cross Blue Shield of Mich.*, No. 2:19-CV-10662, 2020 WL 6939667, at *1 (E.D. Mich. Nov. 25, 2020) (corporate deponent need not testify to a topic that sought a legal conclusion).

[90]    "The date of an adverse employment decision is the relevant date for determining whether a plaintiff is a qualified individual with a disability." *Equal Employment Opportunity Comm'n v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 104 (D. Md. 2019) (quoting *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000)). *See also Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 658 (10th Cir. 2014) (finding that the plaintiff did not meet her burden of proving that she had limited abilities to lift and walk "as of the time she alleges she should have been reasonably accommodated, which she must do").

to employment with HP) reflecting only 'limited range of motion' of the toe with no reference to ambulatory issues and no mention of any limitation of a major life activity, much less a substantial limitation, and instead merely reflected his request for new shoe inserts (*i.e.*, not a medical recommendation), and a pain level of 2/10, described as "mild." JA.519.

It is particularly notable that prior to voluntarily producing this document in discovery, Israelitt himself chose to redact significant portions, including omitting all of page 2, which in its unredacted form included the provider's comment that the patient "desires eval for permanent disability parking, *by strict interpretation of criteria, patient does not qualify* but since he is well known to podiatry, please eval this patient and advise about completion of form." JA.830-831 (emphasis added).[91]

Israelitt also offered two radiology reports from 2005 and 2018, thirteen years apart. JA.517-518. The 2005 report merely notes "degenerative changes" in a joint of the big toe. JA.517. The 2018 report noted "mild degenerative changes at the great right toe." JA.518. Neither report mentions ambulatory issues or physical

---

[91] *Compare* JA.827 *with* JA.830-831, reflecting redacted portions, including bottom right corner notation "Page 1 of 2." Israelitt produced page 1 as redacted, obscured the fact that it was 2 pages, then subsequently sought to keep this information out by arguing irrelevance and objecting to being questioned on them in Israelitt's deposition, yet after the court issued a limiting ruling on discovery at his request, he changed his mind and chose to rely directly on page 1 himself (in redacted form) in response to summary judgment, thus waiving any objection to its use. *See* SA.5-11. A party may not rely on certain portions of a document, while withholding other portions. Fed. R. Evid. 106.

limitations and certainly fails to support Israelitt's claim that he "can barely walk" or that his toe is "extremely painful."

Indeed, Israelitt failed to provide any substantive information on medical treatment, dodging the question when directly asked and hedging only that he saw a doctor "periodically," JA.1015, yet producing no evidence of treatment at *any point* between 2006 and 2018, and no evidence whatsoever of a substantial limitation.

Simply because Israelitt has a handicap parking placard does not prove disability under the ADAAA based on his toe condition, particularly as state parking regulations are not based upon the same criteria as the ADA. As the court found in *Marchetti v. Kinross Gold U.S.A., Inc.*, plaintiff's unauthenticated photocopy of a handicap placard with his name on it (more than Israelitt has here, as his photocopied placard does not even bear his name), did not establish a disability under the ADA.[92] 2:15-cv-02095, 2017 WL 2174952, at *3 (D. Nev. May 17, 2017).[93] Likewise, in Israelitt's parking placard applications, which Israelitt also redacted prior to

---

[92] The podiatrist note which indicates he does not even technically qualify for a handicapped placard (and which Israelitt sought to hide) strongly undermines any value of his parking placards as evidence of ambulatory issues or a disability at all. JA.831.

[93] *See also Johnson v. J.C. Penney Corp., Inc*., No. CV-13-S-1088-NE, 2015 WL 12765882, at *3 (N.D. Ala. Mar. 31, 2015) (because definitions for disability are not the same under the ADA and state regulations for disabled parking placards, court permitted jury instruction explaining that receipt of a disabled parking placard did not mean the plaintiff was disabled under the ADA).

production, he obscured the code identifying the basis for the disability assertion; thus, such documents are utterly useless in proving disability and should be disregarded. *See* JA.520-521.

Nor is his general claim of pain enough. Israelitt's statement that "at times" his toe is painful, specifically "when the barometer falls," and his claim that while he admittedly walks regularly for exercise, there is a lot of start and stopping because of vague "problems" fail to show a substantial limitation under any standard. *See* JA.937-938. As courts routinely hold, "evidence of chronic pain alone does not establish a disability under the ADAAA." *Jacobs v. York Union Rescue Mission, Inc.*, No. 1:12-CV-0288, 2014 WL 6982618, at *8 (M.D. Pa. Dec. 10, 2014) *citing Palish v. K&K RX Servs., L.P.*, No. 13–CV–4092, 2014 WL 2692489, at *8 (E.D. Pa. June 13, 2014) ("While Plaintiff correctly notes that Congress sought to relax the standard for the 'substantially limits' factor when it passed the ADAAA, he still must establish that his impairment substantially limited a major life activity beyond just merely causing pain."); *Danielle-DiSerafino v. Dist. Sch. Bd. of Collier Cnty., Fla.*, 756 F. App'x 940, 943 (11th Cir. 2018) (per curium) ("[p]ain alone is insufficient to establish a disability if the evidence does not show impairment of a major life activity," and affirming finding that teacher who suffered pain failed to

show she was disabled under the ADAAA where she did not also show she was substantially limited in a major life activity.).[94]

Further, inference is not enough; it is insufficient to simply show a person was at some point diagnosed with a condition. *See Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 709-10 (D. Md. 2013) (medical diagnosis alone was not sufficient to show that the plaintiff had an actual disability). And, where an employee offers no medical evidence of a limitation and only his own uncorroborated testimony, that is insufficient to establish a substantial limitation. *See Simpson v. Vanderbilt Univ.*, 359 Fed. App'x 562 (6th Cir. 2009); and *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1180 (11th Cir. 2019) (finding that the plaintiff's own testimony was not sufficient to establish that she had a disability: "Without minimizing any discomfort these episodes [of plaintiff's condition] may cause [her], the record here is devoid

---

[94]     The *Danielle-DiSerafino* court contrasted this situation with that of *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1344 (11th Cir. 2016) in which the plaintiff claimed of pain and her doctor's identification of "gait dysfunction," finding that pain plus the need for a cane and significant ambulation problems did qualify as a disability under the ADAAA, noting that plaintiff had back pain, spinal stenosis, arthritis and a hip replacement, was forced to use a cane, and had significant issues walking; and *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264 (11th Cir. 2014), in which the plaintiff suffered from pain sufficient to substantially limit his ability to perform multiple functions; plaintiff provided an affidavit from his treating physician explaining detailed reasons for the pain, specifically which and how it affected plaintiff's physical activities, and that it was a substantial and permanent condition. Here, in sharp contrast, Israelitt produced no medical or other documentary or testimonial evidence to support a claim that his alleged pain was substantially limiting.

of evidence of the severity, frequency, and duration of these episodes. Nor is there any evidence of the extent to which they limit [plaintiff's] ability to sleep or that could lead a reasonable jury to conclude that [plaintiff] is substantially limited in a major life activity."). And to the extent Israelitt offered purported medical evidence, it was both far removed from the relevant time period and failed to support his claim that he was disabled.

In sum, while Israelitt and the EEOC argue that an impairment need not significantly restrict a major life activity, an impairment must still *substantially* limit a major life activity. 29 C.F.R. § 1630.2(g)(1)(i). Regardless of whether the district court quoted or even relied on an earlier version of the ADA regulation, the undisputed evidence nevertheless supports the conclusion that Israelitt was not disabled within the meaning of the ADAAA. *Skerce v. Torgeson Elec. Co*., 852 F. App'x 357, 362 (10th Cir. 2021) (finding that although district court relied on prior ADA standards, where evidence showed that certain conditions did not qualify plaintiff as disabled, court's grant of summary judgment on such conditions should be affirmed). Accordingly, this Court should affirm the district court's grant of summary judgment on this issue.

### 1.   <u>Even if Israelitt were a qualified individual with a disability, he failed to show pretext.[95]</u>

Israelitt next argues that in opposition to summary judgment, he "provided sufficient evidence to generate a jury question whether he was satisfactorily performing."  Appellant Brief at p. 46.  Setting aside the fact that he now unabashedly relies on a plethora of inadmissible hearsay emails (much of which the trial court properly excluded, a determination he has not contested)[96]; irrelevant group affirmations that did not speak to his personal performance; and the opinions of irrelevant non-decision makers, the correctness of the finding at summary judgment on his discrimination claim is confirmed by looking to the district court's factual findings at trial.  The court ruled on the *exact same question* as to the legitimate reason for his discharge, following two days of trial.  In other words, the court considered a full evidentiary presentation at trial, as both his discrimination and retaliation claims of wrongful discharge were based on *the exact same facts*.

The district court found that "the evidence elicited at trial—both documentary and testimonial—unequivocally demonstrates that Mr. Israelitt was terminated

---

[95]   Israelitt does not contest the summary dismissal of his claims of failure to accommodate or harassment; or the trial court's finding that his discharge was not retaliatory.

[96]   Ironically, Israelitt now relies in his brief on the same hearsay (emails by Kevin Doty) to which he objected during trial.  *See* JA.377, and Appellate Brief at p. 5-11.

because he was an incompatible teammate who failed to take directions from his superiors, and, most significantly, failed to make any meaningful progress on the tasks that were assigned to him." JA.77. The court further found a "mountain of evidence that Mr. Israelitt was fired simply because he was an incompatible and unproductive employee." JA.79.

First, and significantly, Israelitt has not contested this portion of the trial court's finding, which logically precludes a different finding on this element of the analysis—whether his termination was for a legitimate reason—simply by arguing that it was discriminatory rather than retaliatory. Second, even if he did contest it, findings of fact, including that Israelitt was not satisfactorily performing his job and that his discharge was based on a legitimate reason, are reviewed under the clear error standard, and there is nothing to suggest those findings were in error. *Walsh*, 19 F.4th at 676.

Israelitt now challenges his termination by couching it as a discrimination claim, despite that it relies on the precise facts that formed the basis of his retaliation claim, primarily the temporal order in which the events unfolded, and on which the trial court expressly found that none of the decisions by Romas with respect to Israelitt "were in any way related to his benign requests for accommodations that HP never opposed." JA.79. And as noted above, Israelitt now heavily relies on a multitude of improper hearsay, much of which was expressly excluded at trial

(evidentiary rulings that Israelitt has not contested). Not only should these be disregarded, but the opinions of coworkers and other non-decision makers on Israelitt's work is irrelevant (and at any rate do not support his claims). *See* JA.146-147, JA.377, JA.422.

Given the extensive evidence, there is no basis for a different finding on the legitimacy of the reason for discharge in the context of the discrimination claim. Though Israelitt suggests an "obvious set-up for termination," he provides absolutely nothing to support such a ludicrous conclusion. On the contrary, Romas interviewed and hired Israelitt for a new role to fill a gap in his team, and Israelitt worked remotely from his home. JA.371, JA.191. It defies both logic and the evidence to claim that Romas instead bore some nefarious animus because of Israelitt's toe condition, and that after personally hiring him for a specific need, he would engage in a months-long ploy to fire him. Israelitt offered no evidence to support this contention. Moreover, as the trial court found, the evidence suggested the exact opposite; that Romas provided Israelitt with multiple opportunities to succeed, and that to find otherwise was "both incredible and unsupported." JA.79. Thus, Israelitt has no evidence to support a finding of pretext, much less to find that the district court's ruling was clearly erroneous. Accordingly, this Court should affirm the finding of summary judgment on this basis as well.

### C.    The district court correctly applied the *Burlington Northern* standard to alleged actions beyond discharge and correctly determined that they were not adverse.

Israelitt and the EEOC argue that the district court failed to apply the correct standard for retaliation claims under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) in finding that certain decisions beyond Israelitt's discharge were not adverse actions. *Burlington* established that in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68.

The EEOC argues that the trial court applied the incorrect standard in citing the Fourth Circuit's holding in *Laird v. Fairfax Cnty., Va.*, 978 F.3d 887 (4th Cir. 2020). *Laird* held that a claim was not adverse in the retaliation context if it did not create "a significant detriment." *Id.* at 893. The EEOC argues that *Laird*'s holding essentially ignores *Burlington* and equates the actions to the discrimination standard. EEOC brief at p. 10, 22-24. As shown below this Could should affirm the district court's ruling because (1) the district court *did* apply the correct standard and correctly found that the actions complained of by Israelitt outside of his discharge were not materially adverse in the retaliation context; and (2) the matter is irrelevant because the court found ***no evidence*** of a retaliatory animus by Romas, nor any causal connection between Israelitt's protected conduct and the actions.

42

Israelitt argues that several actions were adverse in the retaliation context: (1) removal from meetings (*i.e.*, scrum calls) and non-attendance at a conference and team meeting; (2) increased workload and tightened deadlines; and (3) being removed from billable work.[97]  Although Israelitt quotes the *Burlington* standard, he goes no further and merely asserts that the court erred without legal analysis. Instead, he simply cites to two cases, neither of which is on point.  First, he points to *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010).  In that case, the supervisor posted plaintiff's EEO complaint on the Secret Service intranet, where her fellow employees could and did access it; and second, increased her workload several times that of other employees, indicating he did so "to keep her too busy to file complaints."  *Id.* at 1164.  On summary judgment, the court did not necessarily hold that either action standing alone was sufficient to constitute an adverse action but noted that in combination they could.  *Id.* at 1166.

This case is easily distinguished from *Mogenhan*.  First, the instant case is past the summary judgment stage, and full evidence was presented; that evidence does not, however, support Israelitt's claim that his deadlines were tightened or his

---

[97]  At summary judgment, the district court determined that these events were not adverse actions in the discrimination *or* the retaliation context.  JA.42. Israelitt does not appear to contest these particular findings as to the discrimination claims, and it is not clear if he is contesting the attendance at the HP Protect or St. Augustine meeting in the retaliation context.  Regardless, because the court found no evidence of a discriminatory animus and no causal connection to ***any*** of Romas' actions, such an argument is moot.  *See* JA.42-43, JA.79.

workload was increased, particularly in the manner set out by *Mogenhan*, in which it was clear that the supervisor purposely increased the individual's workload. Here, in contrast, there is no evidence that the workload was even increased; rather, as the evidence at trial reflected, milestones and deadlines were simply set forth in a PIP based on an utter and undisputed lack of productivity by Israelitt. JA.400-401. Israelitt failed to perform his work; thus, Romas had to reexplain and clarify Israelitt's duties. As the district court observed, Israelitt had a fundamentally different belief regarding what a technology roadmap "should be" versus what Romas was actually seeking, a fact that formed the basis of Israelitt's claim that his work assignment was too onerous. JA.78. Moreover, the PIP certainly did not result in a heavier, much less 'impossible' workload for Israelitt that he could not meet despite his efforts; on the contrary, the evidence showed at trial that rather than give it his best effort, he gave no effort. He dug in his heels and produced virtually *nothing*. JA.407-408. Thus, *Mogenhan* is inapplicable.

Second, Israelitt cites to *Billings v. Town of Grafton*, 515 F.3d 39, 55 (1st Cir. 2008), which also considered a summary judgment ruling. In *Billings*, the First Circuit explained that a supervisor's actions in investigating and reprimanding an employee for opening his mail, as he specifically stated, "in light of her pending litigation," and threatening her with more serious discipline constituted an adverse action under *Burlington*. *Id.* at 54-55.

*Billings* is also inapposite.  Israelitt was never investigated, threatened, or disciplined.  Rather, the trial court found he was given "every opportunity to succeed." JA.79.  Romas provided Israelitt with a senior mentor; reassigned him to his own projects that better suited his skills and removed him from "uncomfortable interactions with colleagues"; went out of his way to describe deliverables; and stayed in constant communication.  JA.79.  Israelitt was simply placed on a warning with a performance improvement plan, with specific steps to help him meet goals, a fundamentally different type of action from an openly retaliatory investigation, reprimand, or threat.

Israelitt asks this Court to make a blanket reversal of the trial court's findings and consider all of his complaints adverse theorizing that they are similar to these cases.  But as the Court held in *Burlington*, "the standard is phrased in general terms because the significance of any given act of retaliation may depend upon the particular circumstances." 548 U.S. at 54-55.  Here, the district court considered the factual circumstances of each particular act complained of, and, other than discharge, found ***none*** sufficient to rise to the level of a materially adverse act in the retaliation *or* discrimination context.

As to the Fourth Circuit's use of the phrase 'significant detrimental effects' (and quoted by the trial court here), such language is in complete alignment with the *Burlington* opinion, which explains that a challenged action must be "materially

45

adverse," which "separate[s] significant from trivial harms." *Id.* at 54. An adverse retaliatory action, by definition, must have some detrimental effect, and the Supreme Court expressly distinguished a "materially adverse" action as one that results in "significant" rather than "trivial" harm. *Id.* Thus, the use of the phrase "significant detrimental effects" is not, as the EEOC and Israelitt would argue, in conflict with the *Burlington* standard, but rather conforms to that standard.

Moreover, the correct standard was applied here. When assessing Israelitt's claims at summary judgment, the district court considered several alleged actions besides discharge. The court first explained that none affected his employment, and the undisputed evidence showed that "[t]he conference and the trip were one-time, non-mandatory events with no bearing on [Israelitt's] ability to perform his work duties," observing that while he would have liked to attend, there was no demonstration of "any concrete detrimental impact," "let alone a significant one." JA.42. Accordingly, because the court found no detrimental impact, it clearly fell below the materially adverse standard set forth in *Burlington*.

Likewise, the court explained that Israelitt himself stated via email at the time of his removal from scrum meetings, that "there was no problem with that from his viewpoint," a finding which "foreclos[ed] any possibility that the removal could be considered adverse." JA.42. Thus, this allegation too clearly fell short of *Burlington*.

Similarly, Israelitt suffered no impact to his employment when he was asked to stop charging to the DHS B&P code rather than the CSG overhead. First, as to Israelitt's claim to this Court that he was removed from 'billable work,' this is a gross misstatement of the facts and his dramatic claim of a 'death knell' is completely without support.[98] Israelitt was ***never*** billed to a client. Rather, for a period he allocated his time to the DHS B&P accounting code, a specific expense HP incurred in preparing a bid proposal.[99] When May, who oversaw the project budget, instructed that he no longer charge to that project code, his time was simply re-allocated to overhead.[100] And, as Romas explained, at one point or another, his entire team billed to overhead, and that even when team members charged to a different code or project, they would always eventually come back as overhead.[101] Thus, Israelitt's characterization of his reallocation of charged time is blatantly incorrect and had no detrimental effect, much less sufficient to qualify as an adverse action. None of these minor issues reach the standard set forth by *Burlington*, and the district court correctly found no adverse action other than discharge.

---

[98]    See Appellate Brief at p. 52 (claiming that DHS was a 'billable client,' an assertion with no support and utterly belied by the facts.)

[99]    JA.369.

[100]   JA.395.

[101]   JA.395.

1.    **The Court should affirm the district court's holding because there is a complete absence of animus or causal connection.**

This Court should additionally affirm the district court's holding because it found no evidence of a discriminatory or retaliatory animus at the summary judgment or trial stage, an element on which Israelitt bore the burden of proof. The court stated in its ruling on summary judgment that, "[p]ut simply, nothing in the record even begins to suggest that Romas [the decision-maker] . . . possessed a discriminatory animus linked to Plaintiff's medical condition." JA.42. Following trial, at which Israelitt had the opportunity to cross-examine Romas and put on additional evidence, the court likewise expressly found that no evidence "that any of these [complained-of] decisions were in any way related to [Israelitt's] benign requests for accommodations that HP never opposed." JA.79. Israelitt does not challenge these findings on appeal. Without animus driving these decisions, the complained-of actions are merely commonplace workplace disagreements and cannot support a finding of discrimination or retaliation under ***any*** standard. The Court should affirm this holding as well.

D.    **The district court's consideration of an exhibit that was not admitted during the bench trial was harmless error.**

Israelitt's final argument is that reversal is warranted because the district court quoted from a single exhibit that was not ultimately admitted at trial to "bolster its conclusion that Mr. Israelitt is a poor performer." Appellant Brief at p. 53. The

exhibit in question was not excluded by the court; rather, it was included on Defendant's exhibit list and simply not used during testimony. Thus, though Defense Exhibit 36, JA.815-816 was not separately admitted at trial, the district court's consideration of the exhibit was, at most, mere harmless error.

In its Memorandum of Decision, the district court concluded that even if Israelitt engaged in protected conduct, that conduct was not the "but-for" cause of his termination. JA.77. Rather, the court made a finding of fact that the evidence elicited at trial "unequivocally demonstrates that Mr. Israelitt was terminated because he was an incompatible teammate who failed to take directions from his superiors, and most significantly, failed to make any meaningful progress on tasks that were assigned to him." JA.77. The court relied on multiple sources of documentary and testimonial evidence in making this finding of fact, in addition to citing Defense Exhibit 36. Indeed, Israelitt's use of the term "bolster" rather than 'prove' implicitly concedes this document was not the full panoply of evidence relied upon by the court, and merely one piece of a "mountain" of evidence that supported the court's findings.

For instance, the court found that "the unrefuted evidence demonstrates that he failed to make any meaningful progress on [assigned tasks]—even when he was given one final chance." JA.78. In support, the court cited Romas's testimony and to Plaintiff Exhibit 35 (performance warning) JA.623-624, JA.78. The court also

49

found that after Israelitt was given the performance warning and directed to work on the Technology Roadmap project, "he made no discernable progress, even after Mr. Romas's affirmative efforts to explain the deliverable he envisioned and to encourage Mr. Israelitt to make some progress toward that goal." JA.78. Again, the court cited to additional evidence, including Romas's testimony, Plaintiff Exhibit 35 (performance warning, JA.623-624), and Defense Exhibit 1 (Romas's notes on Israelitt's performance, JA.743-744). None of these findings relied solely on Exhibit 36.

When looking at the record in its entirety, the district court's factual finding that Israelitt "failed to make any meaningful progress on tasks that were assigned to him," is clearly supported, even without taking into consideration Defense Exhibit 36. Under the narrow scope of review and the deference afforded the trial court's findings of fact, this Court should find that the district court's reliance on such a document was mere harmless error.

## **CONCLUSION**

For the reasons set forth above, Defendant-Appellee Enterprise Services LLC respectfully requests that this Court affirm the District Court's orders.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee Enterprise Services LLC ("Appellee") does not believe that oral argument is necessary in this case. Appellee believes that the facts and legal arguments are adequately presented in the brief and record, and the decisional process would not be significantly aided by oral argument.

Respectfully submitted,

*/s/ Heather F. Crow*
Heather F. Crow
KULLMAN LAW FIRM
hfc@kullmanlaw.com

Allison A. Fish
KULLMAN LAW FIRM
A Professional Law Corporation
1600 Poydras Street, Suite 1600
New Orleans, LA 70163
(504) 596-4161 – Direct
(504) 596-4189 – Fax
aaf@kullmanlaw.com
*Attorneys for Appellee*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations for Fed. R. App. P. 32(a)(7)(B), as the brief contains 12,060 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word, 14-point Times New Roman font.

As permitted by Fed. R. App. 32(g), the undersigned relied upon the word count of a word-processing system in preparing this certificate.

*/s/ Heather F. Crow*

## **CERTIFICATE OF SERVICE**

I certify that on 15th day of August 2022, I filed the foregoing using the electronic CM/ECF system, which will send notice to counsel of record.

*/s/ Heather F. Crow*